**TEXAS AND NEW ORLEANS RAILROAD COMPANY, Missouri Pacific Railroad Company and the Texas Mexican Railway Company, Appellants,**

v.

**BROTHERHOOD OF RAILROAD TRAINMEN et al., Appellees.**

No. 19164.

United States Court of Appeals
Fifth Circuit.

July 6, 1962.

Rehearing Denied Aug. 17, 1962.

Elmore H. Borchers, Laredo, Tex., Palmer Hutcheson, Jr., Tom M. Davis, John F. Heard, Houston, Tex., for appellants.

George L. Schmidt, Houston, Tex., for appellees.

Before RIVES, CAMERON and GEWIN, Circuit Judges.

RIVES, Circuit Judge.

This action was brought on July 7, 1961 by the Texas and New Orleans, the Missouri Pacific, and the Texas Mexican Railway Companies, under 28 U.S.C. § 1331, to enjoin a strike by the Brotherhood of Railway Trainmen set for July 10, 1961 in Corpus Christi, Texas. On the same day the action was brought, the court below issued a temporary restraining order and set the hearing of the motion for preliminary injunction for July 12. In an opinion dated July 21, the court concluded that the Norris-LaGuardia Act, 29 U.S.C.A. § 101 et seq., precluded injunctive relief and on July 24 denied the request for a preliminary injunction. On the same day, however, the court entered an injunction pending appeal.

The findings of fact of the district court and its conclusions of law are embodied in an able opinion reported at 197 F.Supp. 348 (S.D.Tex., 1961). The facts will be briefly summarized here. Prior to November 1960 the only rail access to Corpus Christi from the north was by the bascule bridge built in 1926 for the then current demands. Since that time the population of the area has increased some eight times and the bridge became a bottleneck to rail, auto, and maritime traffic. In 1950 the first plans were made for a new high-level vehicular bridge and for a new railway bridge several miles further up the shipping channel. By 1955 contracts were completed with the city for the new railway bridge, and the bridge was completed in the Fall of 1959. Because of the change in location, considerable changes in operation had to be made by the railroads. These changes were incorporated in outline in a Primary Agreement between the various parties involved—the three railroad appellants, the City of Corpus Christi, the County of Nueces, and the Nueces County Navigation District No. 1. Supplemental agreements were then made in accordance with the Primary Agreement between certain of the parties—a Joint Yard Agreement between the Texas and New Orleans and the Texas Mexican and a Joint Track Agreement between the railroads and the Navigation District. The changes more specifically involved in this appeal were: (1) plans of the Texas and New Orleans and the Texas Mexican, which had hitherto conducted separate yard operations, to construct a joint yard under one management with joint switching service by joint crews; (2) new arrangements between the railroads and the Corpus Christi Terminal Association for servicing the port and the industries connected thereto—in particular the industries which the Texas and New Orleans had served up to that time in the vicinity of the old bascule bridge; and (3) various joint car-interchange operations among the railroads through the

use of the Corpus Christi Terminal Association.

Since these agreements involved changes in the working conditions of the railroad employees, negotiations were begun with the unions in May of 1959. Agreements consistent with the Primary Agreement were eventually reached with the various nonoperating unions, the engineers and the firemen. The Railway Trainmen, however, held out. On May 4 and 5, 1960, the railroads served Section 6 notices on the Trainmen in accordance with the Railway Labor Act, section 6, 45 U.S.C.A. § 156, giving 30 days' notice of proposed changes in working conditions.[1] On June 15, 1960, the disputes were referred to the National Mediation Board. Under section 156 (footnote 1, supra) the proposed changes in working conditions could not be instituted until termination of mediation.

Several months later, on October 13, 1960, an application was filed with the Interstate Commerce Commission asking for permission, pursuant to 49 U.S.C.A. § 1(18),[2] to abandon certain old tracks and requesting approval pursuant to 49 U.S.C.A. § 5(2) of the new methods of operation incorporated in the Primary and Supplemental Agreements. On October 27, the Brotherhood of Railroad Trainmen filed a protest on the ground that employees would be adversely affected. On November 16 the Interstate Commerce Commission issued a report, order of approval, and necessary certificates approving the proposed changes. The union protest was denied except for insertion of the normal labor protective provisions. Two days later the bascule bridge rails were cut. With the bridge cut and the proposed changes approved, the railroads put the Primary Agreement and supplemental agreements into effect in spite of the fact that they were still in mediation with the Brotherhood of Railroad Trainmen over the changes in working conditions.

On November 20, 1960, the Brotherhood of Railroad Trainmen filed a suit in the federal court asking that the railroads be enjoined from putting certain of the operational changes into effect. A

---

1. "Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice. In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon, as required by section 155 of this title, by the Mediation . Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board." 45 U.S.C.A. § 156.

2. "§ 1, par. (18). *Extension or abandonment of lines; certificate required; contracts for joint use of spurs, switch-* *es, etc.* No carrier by railroad subject to this chapter shall undertake the extension of its line of railroad, or the construction of a new line of railroad, or shall acquire or operate any line of railroad, or extension thereof, or shall engage in transportation under this chapter over or by means of such additional or extended line of railroad, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity require or will require the construction, or operation, or construction and operation, of such additional or extended line of railroad, and no carrier by railroad subject to this chapter shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity permit of such abandonment. Nothing in this paragraph or in section 5 of this title shall be considered to prohibit the making of contracts between carriers by railroad subject to this chapter, without the approval of the Commission, for the joint ownership or joint use of spur, industrial, team, switching, or side tracks."

temporary restraining order was denied and after various preliminary moves the Brotherhood of Railroad Trainmen asked for and was granted a voluntary dismissal on June 26, 1961. Meanwhile, in May of 1961, the mediation proceedings were terminated since no agreement could be reached and the union refused arbitration. On July 6, notice of the strike giving rise to this suit was served on the railroads.

This suit presents a three-way conflict between major pieces of federal legislation; surprisingly, it appears to be a case of first impression, although all three statutes have been on the books for some 30 years or more. Stated simply, the railroads claim that the union is threatening a strike to force the railroads to violate valid orders of the ICC; that all other federal or state laws are pre-empted by the "exclusive and plenary" authority of the ICC to approve the work changes involved; that the strike is therefore illegal, unprotected by any other legislation, and should be enjoined. The unions reply, (1) that the strike concerns a "labor dispute" within the meaning of the Norris-LaGuardia Act, 29 U.S.C.A. § 101 which withdraws the courts' jurisdiction to provide injunctive relief, and (2) that no injunctive relief is warranted where the railroads instituted the changes in working conditions in violation of the Railway Labor Act, 45 U.S.C.A. §§ 152 Fifth, 156, while the parties were in mediation. Also involved are time claims totalling more than $500,000 for wages lost as a result of the changes.

The Norris-LaGuardia Act, 29 U.S.C.A. § 101 provides:

> "No court of the United States, as defined in this chapter, shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this chapter; nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this chapter."

(See also 29 U.S.C.A. § 104). If this section is applicable, the railroads do not appear to contend that they have satisfied the conditions of the Act to obtain an injunction under it. They must show therefore that either (1) the section, by its own terms, is not applicable to the present dispute, (2) an express grant of jurisdiction is given in other legislation, or (3) the section is pre-empted by other legislation.

■ Looking first to the terms of the statute, there would appear little question that the threatened strike is over a "labor dispute." Under 29 U.S.C.A. § 113 (c), a "'labor dispute' includes any controversy concerning terms or conditions of employment." The railroads themselves recognized that the dispute involved such a controversy when they filed notices on the appellees in May of 1960, in accord with section 6 of the Railway Labor Act, of proposed changes in the appellee's working conditions. Some cases have spoken in terms of "no labor dispute" when in fact they were holding that the Act was not applicable for some other reason. See, e. g., Baltimore & O. R. Co. v. Chicago River & Indiana R. Co., 7 Cir., 1948, 170 F.2d 654. Others have held that there is no labor dispute where railroad unions have threatened a strike before the changes in working conditions were put into effect or before any of the steps contemplated by the settlement machinery of the Railway Labor Act had been taken by the parties. See Brotherhood of Railroad Trainmen v. New York Cent. R. Co., 6 Cir., 1957, 246 F.2d 114. Here, the proposed changes have already been put into effect and the question of whether the Norris-LaGuardia Act is applicable will be taken up later. As a factual matter, the present dispute has every attribute of a "labor dispute."

■ The Norris-LaGuardia Act was passed with the very clear congressional intent to end injunctive interference in labor relations. To make perfectly plain that this intent was not to be frustrated by judicial construction, as had been done so often in the past, the Act went not just to the substantive law to be applied in a

"labor dispute" but to the court's jurisdiction: "No court of the United States * * * shall have jurisdiction to issue any restraining order or temporary or permament injunction * * *." Thus, the appellants must not deal merely with the substantive law to be applied to a "labor dispute," but they must find jurisdiction for a federal court to consider the problem. Clearly, no help is found in 28 U.S.C. § 1331, the general federal-question jurisdictional section under which this action was brought. Nor is the primary section upon which the appellants rely in this action, 49 U.S.C.A. § 5(11), *on its face* of any greater help. This section provides:

"The authority conferred by this section shall be exclusive and plenary, and any carrier or corporation participating in or resulting from any transaction approved by the Commission thereunder, shall have full power * * * to carry such transaction into effect and to own and operate any properties and exercise any control or franchises acquired through said transaction without invoking any approval under State authority; and any carriers or other corporations, and their officers and employees and any other persons, participating in a transaction approved or authorized under the provisions of this section shall be and they are [hereby] relieved from the operation of the antitrust laws and of all other restraints, limitations, and prohibitions of law, Federal, State, or municipal, insofar as may be necessary to enable them to carry into effect the transaction so approved or provided for in accordance with the terms and conditions, if any, imposed by the Commission, and to hold, maintain, and operate any properties and exercise any control or franchises acquired through such transaction. * * *"

█ This section relieves the carriers of the restraints and limitations of other laws, but it does not, on its face, relieve them from the action of other parties, i. e., the union's economic threat of a strike. Further, Norris-LaGuardia could not be considered as a legal restraint or limitation on the carriers and their ability to carry out an approved transaction. It is directed not at the power of the carriers to do anything but to the power of the court to grant injunctive relief. Thus section 5(11) does not, by express terms, grant the jurisdiction which Norris-LaGuardia withdrew.

One broad category of rather narrow exceptions has been made to the strictures of Norris-LaGuardia where, in the words of the Court in Brotherhood of R. R. Trainmen v. Chicago River & Indiana R. Co., 1957, 353 U.S. 30, 42, 77 S.Ct. 635, 1 L.Ed.2d 622, there is "the need to accommodate two statutes, when both were adopted as a part of a pattern of labor legislation." For where Norris-LaGuardia conflicted with the Railway Labor Act, the Court argued, the abuses which Norris-LaGuardia sought to remedy were no longer present since detailed congressional provisions had been made for dealing with railway "labor disputes" under the Railway Labor Act. The Court stated:

"We hold that the Norris-LaGuardia Act cannot be read alone in matters dealing with railway labor disputes. There must be an accommodation of that statute and the Railway Labor Act so that the obvious purpose in the enactment of each is preserved. We think that the purposes of these Acts are reconcilable."

353 U.S. at p. 40, 77 S.Ct. at p. 640. In accordance with such reasoning, the Court has allowed injunctive and equitable relief, (1) when railway unions attempt to strike over "minor disputes," Brotherhood of R. R. Trainmen v. Chicago River & Indiana R. Co., supra; (2) when an employer refuses to bargain with a certified union, Virginian Ry. v. System Federation No. 40, 1937, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789; (3) when a union refuses to fairly represent members of the Negro race, Steele

v. Louisville & Nashville R. Co., 1944, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173; and (4) to compel arbitration when the parties have agreed to settle disputes arising out of a collective bargaining contract by arbitration. Textile Workers v. Lincoln Mills, 1957, 353 U.S. 448, 77 S.Ct. 912, 923, 1 L.Ed.2d 972.

The appellants argue that this category of exceptions is applicable in the present case. They contend that section 5(2) (f) of the Interstate Commerce Act, 49 U.S. C.A. § 5(2) (f),[3] is also part of the national pattern of labor legislation and that an injunction is necessary to carry out its provisions. Section 5(2) (f) makes it the Commission's duty to require as a condition of approval of a § 5(2) transaction that "a fair and equitable arrangement to protect the interests of the railroad employees affected" be included. The railroads argue that this is the only protection to which the employees are entitled, that they obtained such protection in this case, and that the railroads are therefore entitled to an injunction "to preserve the obvious intention" of § 5(2) (f). This is a difficult road to travel.

■ Admittedly, § 5(2) (f) prescribes the maximum protection to which the employees are entitled from the Interstate Commerce Commission. But is the union prohibited from gaining further rights in the transaction through the use of its own economic power—the strike? The appellants are unable to come up with any express legislative history to that effect; rather, they argue that Congress "assumed" that railway labor would be unable to hold out for an understanding more in their interest. It is always dangerous to argue that Congress "assumed" anything, but there are also other considerations which make it unlikely that Congress intended § 5(2) (f) to have such far-reaching effects. In the first place, as the Commission itself pointed out in Chicago, St. Paul, M. & O. RR Lease, 295 ICC 696, 701, "this section only authorizes the imposition of duties upon the carrier. It does not authorize us to direct the employees or organizations of employees to do anything." But more important, labor relations is a highly complex subject. The exceptions the courts have made to Norris-LaGuardia "to accommodate" other labor legislation have only been made where Congress, through such detailed legislation as the Railway Labor Act and Taft Hartley Act, 29 U.S.C.A. § 141 et seq. has "channeled these economic forces [capital and labor] * * * into special processes intended to compromise them" (353 U.S. at 41, 77 S.Ct. at 640), and where these processes would be frustrated without injunctive aid. Do the processes of section 5(2) (f) and the imposition upon the union of a minimum fair and equitable arrangement chosen without its consultation by the carrier provide a complete and proper channel for the compromise of the forces of capital and labor? Can they be compared with the machinery of the Railway Labor Act or the Labor Management Re-

3. "(f) As a condition of its approval, under this paragraph, of any transaction involving a carrier or carriers by railroad subject to the provisions of this chapter, the Commission shall require a fair and equitable arrangement to protect the interests of the railroad employees affected. In its order of approval the Commission shall include terms and conditions providing that during the period of four years from the effective date of such order such transaction will not result in employees of the carrier or carriers by railroad affected by such order being in a worse position with respect to their employment, except that the protection afforded to any employee pursuant to this sentence shall not be required to continue for a longer period, following the effective date of such order, than the period during which such employee was in the employ of such carrier or carriers prior to the effective date of such order. Notwithstanding any other provisions of this chapter and chapters 8 and 12 of this title, an agreement pertaining to the protection of the interests of said employees may hereafter be entered into by any carrier or carriers by railroad and the duly authorized representative or representatives of its or their employees." 49 U.S.C.A. § 5(2) (f).

lations Act? We do not think so. The types of special processes which the courts have enforced with injunctive relief have all involved extensive negotiations and bargaining between the parties, or agreements which result from such bargaining; never processes which allow management to unilaterally choose a change in working conditions and give the union a small voice of protest if the change is unfair or inequitable. For the balancing and compromising of labor and capital ranges far beyond the minimum which is fair and equitable; it extends to such trivial sources of friction between the parties as led the Court to say in United Steelworkers v. American Mfg. Co., 1960, 363 U.S. 564, 568, 80 S.Ct. 1343, 4 L.Ed.2d 1403 in granting enforcement to an arbitration clause:

> "The agreement is to submit all grievances to arbitration, not merely those which the court will deem meritorious. The processing of even frivolous claims may have therapeutic values of which those who are not a part of the plant environment may be quite unaware."

We therefore conclude: (1) that Congress did not intend section 5(2) (f) to delimit the maximum protection the employees could obtain, and (2) that the strictures of Norris-LaGuardia need not be raised to accommodate the obvious intention of section 5(2) (f).

This leaves the basic issue of the Interstate Commerce Commission's power under section 5 of the Interstate Commerce Act, and the meaning to be given to the language of section 5(11) that the Commission's authority is "exclusive and plenary." This pits the transportation policy of section 5, rather than the labor policy of section 5(2) (f), against that of Norris-LaGuardia. If it should be determined that the Commission's authority under section 5 is being frustrated by application of Norris-LaGuardia to the present suit, we would have to conclude that Norris-LaGuardia was pre-empted by section 5(11), even though section 5 is not labor legislation. The problem is by no means easy.

The appellants argue: (1) that it was the clear congressional intention in section 5, and particularly subsection 5(2), to foster the voluntary consolidation and integration of the national railroads, see St. Joe Paper Co. v. Atlantic Coast Line R. Co., 1954, 347 U.S. 298, 74 S.Ct. 574, 98 L.Ed. 710; (2) that the only standards for such consolidations are set down in section 5(2), see McLean Trucking Co. v. United States, 1944, 321 U.S. 67, 64 S. Ct. 370, 88 L.Ed. 544; (3) that any outside interference, whether it be by legal or private action, is pre-empted, see Texas v. United States, 1934, 292 U.S. 522, 54 S.Ct. 819, 78 L.Ed. 1402. Thus, once a transaction is approved by the ICC, the appellants conclude that the only valid restraint is the railroad's own decision not to go through with the "voluntary" transaction. Whether the cases support this view is questionable.

The essence of the appellants' objective is to unilaterally set certain provisions in a new labor contract in accord with the proposed changes in the Primary Agreement, and to be relieved of an existing labor contract without having to go through the machinery of the Railway Labor Act (the reformation procedure for railway labor contracts) or being subjected to one of the penalties for breach—a strike. They have attempted to accomplish this objective by including such detail in the Primary and supplementary agreements submitted to the ICC for approval as to determine the major provisions of a new labor contract, although at no time were the unions brought into the negotiation of these agreements. The appellants then argue that ICC approval of the agreements makes them binding on the unions. If so, not only does section 5 give the Commission power to approve a section 5(2) transaction, but it gives the carriers the right to legislate the terms of a continuing contract with a third party, although a different contract more favorable to the third party might have been equally acceptable to the Commission. We do not feel the statute may be so interpreted.

Section 5(2) involves "transactions" to achieve certain stipulated ends; these transactions require the approval of the Commission. There is no definition given of what goes into a "transaction," but it appears to be a catchall descriptive term referring to the many different elements involved in mergers, leasing agreements, pooling arrangements, or joint operations. As often described in other contexts, it is a word "of flexible meaning" and "may comprehend a series of many occurrences, depending not so much upon the immediacy of their connection as upon their logical relationship." See Cantrell v. City of Caruthersville, 1949, 359 Mo. 282, 221 S.W.2d 471, 474; Kaumagraph Co. v. General Trade Mark Corp., D.C.N.Y., 1935, 12 F.Supp. 230. Apparently the Commission feels that one of the occurrences or elements involved may be contracts and agreements between interested parties to the transaction, since its regulations require that there be attached to any application for approval of a 5(2) transaction "a copy of any contract or other written instrument entered into or proposed to be entered into pertaining to the transaction covered by the application." 49 C.F.R. § 52.3 (b)(7). It would further appear from sections 5(2) (c) and (f) that the representatives of the carrier employees are included among the interested parties to a transaction and that a new labor contract may be one of the ingredients of a transaction. Now, are we to read into the authority of the ICC to "approve" a transaction, the right of the carrier to unilaterally create one of the contracts which may be necessary to the completion of that transaction and thereupon bind a third party to it? Clearly, that does not follow as a matter of course from the normal meaning of the terms used in section 5(2) (a).

Nor has the ICC, in its interpretation of section 5(2), found any such hidden authority. It looks upon its duties as purely permissive, approving with appropriate conditions contracts, agreements, and consolidations which are negotiated by the parties under the normally applicable law governing such transactions in other fields. As the Commission has often held, it has no power to compel a carrier to undertake a section 5(2) transaction. See, e. g., Baltimore & O. R. Co. Operation, 261 ICC 535, 544; Gulf M. & O. R. Co. Purchase, 267 ICC 265, 269–70; Chicago, Saint Paul M. & O. R. Co. Lease, 295 ICC 696. Further, it has been unwilling to take upon itself questions of either the interpretation or enforceability of contracts submitted with respect to a transaction. Upon occasion, parties, who have come before the Commission with executory contracts to take effect upon approval by the Commission, wish to withdraw from the proceeding. As the Commission said in refusing to dismiss the proceeding in McGary Transportation Co.—Purchase (Portion)—Albert J. Demelle, 50 MCC 608, 611 (1948):

> "As to vendor's desire to withdraw from the transaction, we have repeatedly found that authority granted under former section 213 and present section 5 is permissive only, and may, or may not, be exercised by the parties, and that all matters involving the interpretation and enforcement of the terms of contracts must be left for settlement between the parties themselves or by the courts."

See also, Watson Bros. Transp. Co. v. Jaffa, 8 Cir., 1944, 143 F.2d 340; O. C. Wiley & Sons v. United States, W.D.Va., 1949, 85 F.Supp. 542; Marion Trucking Co.—Purchase—Harwood Trucking Co., 50 MCC 613, 632 (1948); The Service Transport Co.—Purchase (Portion)—F. E. Kerr Co., 59 MCC 481.[4] Even where a carrier has transferred the same rights and equipment to two different parties, the Commission has held that it must treat each application on its merits and let the two vendees litigate their conflict

---

4. "Authority granted under section 5 is permissive only, and, in the event of a dispute, the contractual rights and obligations of the parties are for determination by the courts rather than by us." 59 MCC at 484.

in the courts. Yellow Coach Corp.—Purchase—O. B. Darnell, 59 MCC 185, 193–94. From these cases, we believe the Commission is of the opinion that the carriers must rely upon applicable contract and corporate law to carry their section 5(2) transaction into effect, and may not rely upon the Commission's "approval" to coerce a recalcitrant party into line. Further, we feel that it would be inconsistent with this construction of the statute to hold that, while the carriers must look to local law to enforce the transaction, unions and other noncarrier parties are bound without their consent by the Commission's permissive approval.

The appellants also argue that when the Commission conditions its approval upon the inclusion of employee protective provisions under section 5(2) (f), these conditions bind the employees upon the carriers' decision to go through with the transaction. As already noted, however, the Commission has held that it has authority to impose conditions only on the carrier. Chicago, Saint Paul, M. & O. R. Co. Lease, 295 ICC 696, 701. Further, we can see little purpose to the last sentence of section 5(2) (f) if the most that the unions can bargain for is what they can obtain by right from the Commission. This sentence provides:

> "Notwithstanding any other provision of this Act, an agreement pertaining to the protection of the interests of said employees may hereafter be entered into by any carrier or carriers by railroad and the duly authorized representative or representatives of its or their employees."

To permit the railway unions to enter into an agreement, yet deny them the full use of their bargaining power, i. e., the strike, would make the provision meaningless. On the other hand, by giving it full latitude, we achieve a result consistent with our basic view of section 5 (2): that to carry an approved transaction into effect, the parties must rely upon agreements voluntarily entered into and enforced under local law. In accord with this reasoning, the Commission has refused to hear employee complaints when a protective agreement has been entered into by the parties, enforceable under the applicable local law. DeCamp Bus Lines—Purchase—Atlantic Transport Co., 65 MCC 452, 456.

The appellants have a secondary claim to the effect that one of the issues preventing settlement of the dispute concerns the time claims totalling more than $500,000, representing wages lost as the result of changes in working conditions instituted while the parties were in mediation, in violation of the Railway Labor Act, 45 U.S.C.A. §§ 152 Fifth, 156. These claims are apparently calculated by taking the difference between actual wages under the changed working conditions and wages as they would have been under the old agreement. The appellants claim that these claims are "minor disputes" to be adjusted in accord with the Railway Labor Act, 45 U.S.C.A. § 153, and that under Brotherhood of R. R. Trainmen v. Chicago River & Indiana R. Co., 1957, 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622, injunctive relief is available to insure compliance with the procedures of the Act. It would appear from Order of R. R. Telegraphers v. Railway Express Agency, 1944, 321 U.S. 342, 64 S.Ct. 582, 88 L.Ed. 788, that when working conditions are changed in violation of section 6 of the Railway Labor Act, then the old agreement is considered to remain in effect and the wage claims under the old agreement are minor disputes. See also Western Air Lines v. Flight Engineers Intern. Ass'n, S.D.Cal., 1961, 194 F.Supp. 908, 911.

This issue was not raised in the Complaint, however. The only references to it in the record are two or three pages of testimony describing generally the union demand during the negotiations over the proposed changes that these claims be paid. The claims themselves were not described in any detail, none of them were proved or the exact amount established. The court below did not treat them at all in its main opinion, but, in response to a request for supplemental findings of fact and conclusions of law,

found that "when properly processed by the Brotherhood of Railroad Trainmen under the provisions of the Railway Labor Act, these time claims will be properly referable by the parties involved to the National Railroad Adjustment Board for decision." No relief with respect to the claims was granted.

█ Because of the failure of the appellants to raise the issue in its Complaint or to put the appellees on notice during the trial that this specific relief would be asked, and because of the insufficiency of the evidence on the issue, we believe the relief was properly denied. This conclusion, however, is in no way prejudicial to the right of the appellants to raise the issue again in a court of proper jurisdiction, should they so desire.

The judgment of the district court is due for affirmance.

Nonetheless a caveat seems to be called for by the peculiar facts of this case. Since the bascule bridge has been cut, some changes must go into effect. The question is not, therefore, to change or not to change, but what change. Under these circumstances the carriers might be in the position of having either to accede to union demands involving changes which the Commission would find contrary to the public interest, or helplessly to sit out a crippling strike. Since the Commission can obtain equitable relief to enforce the transaction as approved, and accepted by the carriers, or even prosecute the violation, the carriers could be caught in an insoluble dilemma—although it might be argued that it was one of their own creation. Under certain circumstances, when carriers have been faced with contract demands which would be contrary to the public interest in the effectuation of a section 5(2) transaction, the courts have held that the carrier may be relieved of these demands by the Commission. In Schwabacher v. United States, 1948, 334 U.S. 182, 68 S.Ct. 958, 92 L.Ed. 1305 in a section 5(2) merger, the Commission had referred a dissenting group of preferred stockholders to the state courts for the adjudication of their liquidation rights on merger. This group maintained that, under state law, they were entitled to all their accumulated preferred dividends in addition to the equitable redemption value of their stock. The Commission held that the amount offered these stockholders in the plan of merger was "just and reasonable," but since the amount involved would have little effect upon the resulting financial condition of the merged carrier, the stockholders could pursue their contractual rights in the state court. The Supreme Court remanded the case to the Commission, holding that where the carriers had made a "just and reasonable" offer to the dissenting stockholders, the carriers had the right to be relieved of any additional contractual liability under state law, obligations which would presumably be contrary to the public interest. The Court relied upon the Commission's plenary authority under section 5(11) and its authority to control the carriers' financial structure under section 20a.

While Schwabacher differs considerably from the present situation, both because of the inability of a minority group of preferred stockholders to oppose a merger and because of the unusual control of the Commission over a carrier's financial structure, it may have some bearing on this case. It may indicate that after due notice and hearing, the Commission would have jurisdiction to determine whether the union demands are contrary to the public interest in the effectuation of the section 5(2) transaction. There is no such finding by the Commission in this record; nor can we assume there will be one. Unlike the question of buying out dissenting stockholders where there is only one "just and reasonable" price representing the economic valuation of their stock, there may be many "fair and equitable" arrangements for the appellee unions. There may be many possible combinations of new working conditions that would conform to the general objectives of the carriers in this transaction. The unions may hold out for any possible "fair and

equitable" arrangement. If then the differences between the unions and the carriers prove irreconcilable, and the question is suitably presented to the Commission, it may determine its jurisdiction vel non to find whether certain of the union demands are contrary to the public interest in the effectuation of the transaction. Cf. Gulf M. & O. R. Co.— Abandonment, 282 ICC 311, 332–35. The carriers may have grounds for relief to permit such jurisdiction to be determined and exercised and thereafter to prevent the enforcement of particular demands found to be contrary to the public interest. This matter, both on the law and the facts, if litigable at all, is within the primary jurisdiction of the Interstate Commerce Commission. While we suggest it as a possible avenue of procedure, if the need arises, we have no intention of instructing or affecting the Commission's decision in any way. This bridge may not be reached and should not be crossed until we come to it.

The judgment is

Affirmed.

CAMERON, Circuit Judge, concurs in the result.

### On Petition For Rehearing

PER CURIAM.

In our opinion we stated that, "The findings of fact of the district court and its conclusions of law are embodied in an able opinion reported at 197 F.Supp. 348 (S.D.Tex.1961)." Perhaps we should have made express mention of the supplemental findings of fact, which we did not overlook, viz:

"On motion of plaintiffs I make the following findings of fact and conclusions of law supplementing those contained in my Memorandum Opinion of July 21, 1961.

### "FINDINGS OF FACT

"(1) In addition to the contracts referred to in the Memorandum Opinion of July 21, 1961, in this case, there was also an amended Corpus Christi Terminal Association Agreement, a copy of which was attached to the application filed by the three plaintiffs and Nueces County Navigation District with the Interstate Commerce Commission.

"(2) Beginning at 12:01 A.M., November 18, 1960, when the track leading across the bascule bridge into Corpus Christi was cut by the City of Corpus Christi, the plaintiffs started railroad operations in accordance with the four contracts, copies of which were attached to the application with the Interstate Commerce Commission and in accordance with the authority granted by said Commission in its order of November 16, 1960. Operations in such manner have continued to date.

"(3) The strike which the Brotherhood of Railroad Trainmen called against the three plaintiffs to start on Monday, July 10, 1961, was for the purpose of compelling said plaintiffs to make agreements providing for operations different from those authorized by the said Commission in its Order of November 16, 1960, and particularly in the following respects:

"(a) To require Texas and New Orleans Railroad Company and The Texas Mexican Railway Company to conduct separate operations, including separate Corpus Christi Terminal Association (C.C.T.A.) operations, in the Corpus Christi Terminal instead of joint operations.

"(b) To require Texas and New Orleans Railroad Company, as distinguished from C.C.T.A. to switch its former yards and industries in the Hughes Street-Tancahua Industrial Area. In order to reach said tracks, yards and industries as an individual railroad it would be necessary for Texas and New Orleans Railroad Company to operate over trackage owned by Missouri Pacific Railroad Company. Texas and New Orleans Railroad Company is permitted to use said trackage for reaching the area in question when

operating the C.C.T.A., but is not permitted to use Missouri Pacific track for the purpose of reaching the area in question as an individual railroad.

"(c) To require payment by the three plaintiffs to their respective employees of various time claims which have been filed by said employees represented by the Brotherhood of Railroad Trainmen against the three plaintiffs because of the changes in operations which occurred on, and have continued since, November 18, 1960, at Corpus Christi, Texas. At the time of the trial said time claims against the three plaintiffs were in excess of $500,000.00. When properly processed by the Brotherhood of Railroad Trainmen under the provisions of the Railway Labor Act, these time claims will be properly referable by the parties involved to the National Railroad Adjustment Board for decision.

"In addition, defendants' counsel has requested the following findings of fact, which I make:

"Mediation Cases Nos. A–6265, 6266 and 6267 referred to in the stipulation which was made a part of the record in this case, were pending at the time plaintiffs filed the application with the Interstate Commerce Commission in October 1960, for approval of the changes in operation at Corpus Christi, Texas. Said cases were still pending at the time the Commission issued its Order on November 16, 1960, in response to said application and when the plaintiffs changed their methods and manner of operation on November 18, 1960."

The time claims referred to in paragraph (c) of the supplemental findings are the ones to which we had inaccurately referred in our opinion, as follows: "The appellants have a secondary claim to the effect that one of the issues preventing settlement of the dispute concerns the time claims totalling more than $500,000, representing wages lost as the result of changes in working conditions instituted while the parties were in mediation, in violation of the Railway Labor Act, 45 U.S.C.A. §§ 152 Fifth, 156. These claims are apparently calculated by taking the difference between actual wages under the changed working conditions and wages as they would have been under the old agreement." The two sentences of our opinion just quoted are withdrawn.

In our opinion we said: "Prior to November 1960 the only rail access to Corpus Christi from the north was by the bascule bridge built in 1926 for the then current demands. Since that time the population of the area has increased some eight times and the bridge became a bottleneck to rail, auto, and marine traffic." The word "rail" is stricken from the last sentence just quoted.

In our opinion we said: "This suit presents a three-way conflict between major pieces of federal legislation; surprisingly, it appears to be a case of first impression, although all three statutes have been on the books for some 30 years or more." The figure "30" and the final words "or more" are stricken.

The foregoing changes are made in order to avoid any inaccuracy. None of these changes permits a change in the result.

██ Appellees, on their part, urge that " * * * this Court's mandate should dissolve the temporary restraining order pending the appeal previously issued by the District Court." By its terms, the restraining order or injunction pending appeal issued by the district court was to continue in force "during the pendency of the appeal of this case and until a final order has been entered herein on appeal." We agree with the construction implicit in appellees' request just quoted, that is that when this Court's mandate issues, the appeal will no longer be pending and a final order on appeal will have been entered. Hence, by its terms, the restraining order or injunction pending appeal will terminate upon the issuance of this Court's mandate. It is nonetheless true that the mandate may

be stayed under the terms of Fifth Circuit Court Rule 32, 28 U.S.C.A., or to enable the appellants to obtain a writ of certiorari from the Supreme Court. See 28 U.S.C.A. § 2101(f).

The petition for rehearing is Denied.

Merrill, Circuit Judge, dissented.