**G. W. SMYTH, General Movers Corporation, Martin Van Lines, Inc., Plaintiffs,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Defendants.**

**Aero-Mayflower Transit Company, Inc., Allied Van Lines, Inc., Bekins Van Lines Co., Global Van Lines, Inc., Lyon Van Lines, Inc., North American Van Lines, Inc., and United Van Lines, Inc., Intervening Defendants.**

**Civ. A. No. 7086.**

United States District Court
W. D. Washington, N. D.
Aug. 30, 1968.

Edward L. Mueller, Aiken, St. Louis & Siljeg, Seattle, Wash., for plaintiffs.

Richard Albercht, Seattle, Wash., for Intervenors.

Eugene G. Cushing, U. S. Atty., Seattle, Wash., John H. D. Wigger, Washington, D. C., for the Government.

Robert W. Ginnane, General Counsel, and Raymond M. Zimmet, Washington, D. C., Atty., as counsel for Interstate Commerce Commission.

Before POPE, Circuit Judge, and BOLDT and GOODWIN, District Judges.

## OPINION OF THE COURT

PER CURIAM.

This action under 28 U.S.C. §§ 1336, 1398, 2284, and 2321–2325 seeks to set aside orders of the Interstate Commerce Commission served on May 27, 1966, and January 9, 1967, in I.C.C. Docket No. MC–F–8723, General Movers Corp.— Control—Martin Van Lines, Inc., 101 M.C.C. 748. This action was taken before a three-judge District Court pursuant to 28 U.S.C. §§ 2284 and 2325.

By application filed April 17, 1964, as amended, General Movers sought authority to acquire control of Martin Van Lines, Inc. (hereafter Martin) and Messrs. G. W. Smyth, Clarence N. Sayen and Nicholas Schmitt concurrently sought authority to acquire control of Martin through their control of General Movers as joint voting trustees.

On October 29 through November 3, 1964, a hearing was held in Seattle, Washington, and briefs to the Examiner were filed February 3, 1965. By Report and Order served May 28, 1965, the Examiner recommended that the application be denied, finding *inter alia,* (a) that the proposed acquisition of Martin constituted a "single transaction" along with the prior acquisition by General Movers of A. World Van Lines (hereafter A. World); and (b) that at the time of the A. World acquisition, G. W. Smyth, a majority stockholder of General Movers, was "affiliated" with Smyth World Wide Movers, Inc., (hereafter Smyth World Wide).

By Report and Order served May 27, 1966, Division 3 of the Commission modified certain findings of the Examiner and eliminated some other findings, but adopted the Examiner's recommendation that the application be denied. On June 27, 1966, pursuant to § 1.101(a) (3) of the Commission's General Rules of Practice, 49 C.F.R. § 1.101(a) (3), plaintiffs filed a petition for reconsideration of the Report and Order of Division 3. By Order dated December 20, 1966, Division 3, acting as an Appellate Division, denied plaintiffs' petition for reconsideration and request for oral argument.

Under § 17(9) of the Interstate Commerce Act, 49 U.S.C. § 17(9), and the rules and regulations promulgated thereunder, 49 C.F.R. § 1.101(a) (2) and (3), the denial of the petition for reconsideration by Division 3, acting as an Appellate Division, disposed of the Commission proceedings with administrative finality and exhausted the administrative remedies of the plaintiffs before the Commission. That the plaintiffs can bring no more action before the Commission which would, or may, result in the approval of the instant application for the Martin acquisition is clear. The holding by the Commission that the denial was without prejudice to a later application for approval of acquisition of A. World *and* Martin in no way affects the finality of the action taken on the petition before it exclusively concerning the acquisition of Martin. Therefore, the plaintiffs have standing under the Administrative Procedure Act and the Interstate Commerce Act to bring this action.

Without attempting to repeat the factual findings of the Examiner or the Commission as set out in their various reports, the undisputed facts are:

Prior to General Mover's application, G. W. Smyth had owned and controlled a non-carrier holding company, Smyth World Wide, which controlled, until the end of 1963, at least two carriers of household goods that were regulated by the Commission and operated between limited points in the United States, mostly in the western states, and Alaska. At the time of the application by General Movers, Smyth World Wide controlled one carrier, the other having surrendered its certificate. Smyth World Wide was an agent of North American Van Lines and was approved by the military as a carrier of containerized cargo in limited areas. Mr. Smyth, apparently

desirous of having a nationwide carrier of household goods of his own, became interested in acquiring what he termed the "A. World—Martin complex." For exploration of the feasibility of that acquisition, he hired Clarence Sayen, an ex-airline pilot with no prior motor carrier experience. Foreseeing some difficulty, either with North American or the Commission, in making such an acquisition while he still controlled Smyth World Wide, Mr. Smyth sold his interest in that concern to San Raphael and Associates. Smyth apparently retained only a token interest in Smyth World Wide, but was retained by San Raphael as a consultant with a $25,000.00 per year salary.

Before its transfer to San Raphael, Smyth World Wide had obtained options from the owners of A. World and Martin for the purchase of controlling interest in both companies through the purchase of stock. Those options were not exercised by Smyth World Wide but were transferred to Mr. Sayen at the same price as they had been purchased. Mr. Sayen then formed General Movers. Immediately after the transfer of Smyth World Wide to San Raphael, Mr. Smyth appeared as the majority shareholder in General Movers. All of the shareholders entered into a voting trust agreement naming Messrs. Smyth, Sayen and Schmitt joint voting trustees. One day after Smyth had become the majority shareholder, General Movers entered into arrangements whereby it gained control of A. World. The terms of those agreements and their exact nature are unknown due to the plaintiffs' refusal to produce them unless "directed" to do so. The options first held by Smyth World Wide were never exercised. The control of A. World was gained through the purchase by General Movers of the stock of World Van Service, Inc. (hereafter World Van), a noncarrier which had been in control of A. World. Approximately three weeks after the acquisition of A. World, General Movers agreed to acquire Martin by entering into a series

of contracts with the persons controlling Martin. By application filed with the Commission, General Movers, as a noncarrier already in control of a carrier, sought approval of the proposed acquisition under 49 U.S.C. § 5(2).

Prior to the involvement of G. W. Smyth or General Movers with the A. World—Martin complex, the record shows that A. World and Martin, together with Rocky Ford Moving Vans, had arrangements permitting a nearly nationwide moving service. The arrangements between those three companies prior to the acquisition by General Movers of A. World resulted from a series of events which left A. World controlled, at least de facto, by Donald C. Taylor, half-owner of Martin. World Van, which had controlled A. World de jure, was held two-thirds by Irving Anches, a close associate of Donald C. Taylor in many other enterprises, and one-third by Howard Ford, general manager of Rocky Ford Moving Vans. World Van entered into agreements with both A. World and Martin whereby World Van took over the clerical details of both operations, including such things as issuing bills of lading and billing for services. In return for those services, World Van received five percent of the gross revenues of each company. One Beckett, an employee of Martin, went over to A. World, but still remained under Taylor's direction, and organized its activities, including interline arrangements with Martin and Rocky Ford.

It was after the above arrangements between Martin and A. World were in existence that G. W. Smyth and/or General Movers became interested in acquiring control of the two companies.

The transaction through which General Movers acquired control of A. World was not presented to the Commission for approval, General Movers taking, and still asserting, the position that that transaction was separate and apart from the acquisition of Martin and therefore it was not necessary under 49 U.S.C. § 5 to receive Commission approval.

From these undisputed facts, the Commission concluded that the purchase of A. World and Martin constituted the acquisition of two carriers by a non-carrier. The Commission considered this acquisition to be a single purchase and not two separate and distinct transactions and required General Movers to seek its approval of the acquisition of both carriers. We affirm the Commission's order. There is substantial evidence in the record to support its conclusion. Therefore, the complaint filed with this Court must be dismissed. Tampa Traffic Ass'n v. United States, 132 F.Supp. 948 (D.C.Fla.1955); Mitchell Bros. Truck Lines v. United States, 225 F.Supp. 755 (D.C.Ore.1963), aff'd, 378 U.S. 125, 84 S.Ct. 1647, 12 L.Ed.2d 744, rehearing den. 379 U.S. 872, 85 S. Ct. 19, 13 L.Ed.2d 78.

Section 5(2) of the Interstate Commerce Act, 49 U.S.C. § 5(2), requires certain acquisitions concerning carriers under Commission regulation to be presented to the Commission before they may be legally affected. Those are: (1) when one carrier acquires another; (2) when a non-carrier in control of one carrier acquires a second carrier; and (3) when a non-carrier acquires two or more carriers. The crux of the controversy in the present case is whether the plaintiffs are attempting to purchase one carrier after being in control of one other carrier or whether the plaintiffs are purchasing two carriers in a "single transaction."

The plaintiffs have steadfastly maintained that their purchase of A. World is completely independent of their purchase of Martin. While it may be true that one can split the acquisitions into separate parts, the Commission is not required to accept the definition of any group of events that the applicant wishes to present. Indeed, the whole background of federal regulatory agencies suggests that such is the opposite of the role they were created to play. The Interstate Commerce Commission was created to oversee the activities of common carriers in such a manner that these carriers would act for the benefit of the public which they serve, rather than their own benefit. If the Commission were required to look only to the facts which a particular carrier, or non-carrier, wished to present to it, or to accept the characterization of a set of facts that the carrier placed on these facts, the effectiveness of its authority would be seriously hampered, if not destroyed altogether.

Section 5(2) does not require that the acquisition of two or more carriers by a non-carrier take place in one day or at one time to come within the ambit of those transactions for which Commission approval is required.

"Section 5(2) involves 'transactions' to achieve certain stipulated ends; these transactions require the approval of the Commission. There is no definition given of what goes into a 'transaction,' but it appears to be a catchall descriptive term referring to the many different elements involved in mergers, leasing agreements, pooling arrangements, or joint operations. As often described in other contexts it is a word of 'flexible meaning' and 'may comprehend a series of many occurrences, depending not so such upon the immediacy of their connection as upon their logical relationship.' See Cantrell v. City of Caruthersville, 1949, 359 Mo. 282, 221 S.W.2d 471, 474; Kaumagraph Co. v. General Trade Mark Corp., D.C.N.Y.1935, 12 F.Supp. 230."

Texas & N.O.R. Co. v. Brotherhood of Railroad Trainmen, 5 Cir., 307 F.2d 151, at 159, cert. den. 371 U.S. 952, 83 S.Ct. 508, 9 L.Ed.2d 500, rehearing den. 375 U.S. 871, 84 S.Ct. 28, 11 L.Ed.2d 101.

So often have courts held that the Commission has the expertise to examine knowingly the complex transactions involving the services, rates and inter-relationships of carriers within the area of its regulation, that no case need be cited for that proposition. The facts presented by this case are a prime example of the situation which needs ex-

pert, knowing interpretation. The activities of G. W. Smyth before the actual purchase of A. World as well as the inter-related management and facilities of A. World and Martin before that time can only be thoroughly understood by one with a significant amount of experience in the area of carrier management. The Commission is a group of such persons.

The facts recited above would indicate to even the casual observer that G. W. Smyth was extremely interested in keeping as many of the multitude of corporate transactions from Commission scrutiny as possible. That same observer would notice that the relationship between A. World and Martin was more than casual interline arrangements. While it may be that the relationship between A. World and Martin was not fostered by plaintiffs, it is not unreasonable to decide that they would not have wanted either of those companies without the other. It is also not unreasonable to decide that the interest of the public in the purchase of one of those companies could not be properly decided without consideration of the purchase of the other company. It would appear somewhat an anomaly for a person with a great deal of experience in a certain region to purchase a carrier in a completely different region without the thought or intention of acquiring another which would tie the first into that region, especially where there is an existing relationship between the two carriers which would accomplish that result. This Court cannot state that there is no substantial evidence from which the Commission could reach the conclusion that the purchase of A. World could not be separated from the purchase of Martin. The fact that those purchases did not occur at the same moment does not change that result. Few would argue that the take-off of an airplane is completely separable from its landing. One would not happen without the other and the first necessitates the second. The Commission had ample evidence before it to conclude that the purchase of

A. World and Martin were the take-off and landing in a flight of carrier organization.

■■ Since we have concluded that there was sufficient basis for the Commission to decide that there was a "single transaction" involved in the purchase of the two carriers by General Movers, it necessarily follows that its denial of approval of a part of that transaction, when the applicant refused, and refuses, to furnish information concerning the other part of that transaction, is within the Commission's jurisdiction and valid. Whenever the Commission decides, upon substantial evidence, that a given set of events constitutes an acquisition of two carriers by a non-carrier, that series of events is within the jurisdiction of the Commission, and it is up to the Commission to decide whether such acquisitions are consistent with the interest of the public. The Commission has determined that giving approval to a part of that transaction resulting in the purchase of A. World and Martin without the facts concerning the remainder of that transaction would not be consistent with public interest. We cannot say that that decision was erroneous.

Since the Commission had sufficient basis for refusal of plaintiffs' application due to the incompleteness of that application, the plaintiffs' contentions concerning the lack of adequate evidence and findings of fact to support the Commission's conclusion that G. W. Smyth was "affiliated" with Smyth World Wide at the time of the purchase of A. World are of no consequence. It might be noted, however, that plaintiffs did not present any evidence to show that Smyth had divested all control in Smyth World Wide and to rebut the inference of control which arose from actions taken after the corporate transfer of Smyth World Wide had been accomplished on paper.

Therefore, it is the decision of this Court that the complaint filed in this case should be, and is hereby, dismissed, and the temporary restraining order previously issued be dissolved.