**MISSOURI PACIFIC RAILROAD COMPANY, Plaintiff,**

**and**

**Missouri-Kansas-Texas Railroad Company, Intervenor-Plaintiff,**

**v.**

**UNITED TRANSPORTATION UNION, GENERAL COMMITTEE OF ADJUSTMENT, et al., Defendants.**

**No. 83–771C(1).**

United States District Court, E.D. Missouri, E.D.

March 1, 1984.

Nina K. Wuestling, Mark M. Hennelly, St. Louis, Mo., for plaintiff.

John Clarke & John J. Sullivan, Washington, D.C., Joe C. Crawford, Dallas, Tex., David R. Herndon, E. Alton, Ill., Charles Allen Seigel, St. Louis, Mo., for defendants.

## MEMORANDUM

NANGLE, Chief Judge.

This case is now before this Court on the motion of plaintiff Missouri Pacific Railroad Company (hereinafter "MOPAC") and intervenor-plaintiff Missouri-Kansas-Texas Railroad Company (hereinafter "KATY") for a preliminary injunction enjoining defendants and their members from striking either railroad.[1] In addition, there are several other motions which are now pending before this Court. These include: 1) defendants' motion to refer two (2) issues to the Interstate Commerce Commission pursuant to 28 U.S.C. § 1336(b); 2) plaintiffs' motions for summary judgment on its complaint and dismissal of or summary judgment on defendants' counterclaims; and 3) defendants' cross-motion for summary judgment on plaintiffs' complaint.

## I MOTION FOR PRELIMINARY INJUNCTION

■ The motion for a preliminary injunction was submitted to this Court on a stipulated record consisting of the following: 1) a stipulation of fact[2]; 2) the affidavit of Irving Newcomb which, *inter alia,* attests to the accuracy of the facts stated in defendants' (hereinafter "UTU") "Statement of Facts" contained in *Memorandum of Defendants in Support of Their Cross-Motion To Dismiss, etc.* at 2–12; and 3) the affidavit of O.B. Sayers which, *inter alia,* attests to the accuracy of the facts stated in plaintiff MOPAC's "Background Facts" contained in *Memorandum of Plaintiff Missouri Pacific Railroad Company In Support of Its Motions etc.* at 4–8. In addition, this Court takes judicial notice of the orders of the Interstate Commerce Commission (hereinafter "ICC") entered in connection with the application of MOPAC to consolidate with the Union Pacific Railroad Company (hereinafter "UPRR"). *Fed.R.Ev.* 201. This Court, having considered the record in this case, the pleadings, briefs and exhibits submitted in support of and in opposition to the motion for a preliminary injunction, hereby makes the following findings of fact and conclusions of law.

### A. FINDINGS OF FACT

1. Plaintiff MOPAC is a common carrier regulated by the Interstate Commerce

---

1. On February 7, 1984, this Court granted plaintiffs' motion for a preliminary injunction. At that time this Court issued a very brief memorandum which stated in summary fashion the reasons for granting plaintiffs' motion. This Court indicated that a more complete and detailed explanation of this Court's ruling would be forthcoming. The memorandum filed herein this day is the memorandum promised. However, in addition to discussing plaintiffs' motion for a preliminary injunction, this memorandum addresses the pending motions for referral to the Interstate Commerce Commission and for summary judgment.

2. The manner in which the parties developed the record for this motion was poor to say the least. As stated in this Court's *Memorandum* dated February 7, 1984, the parties stipulated to a record in this case during an in-chambers conference, held on-the-record, on February 1, 1984. It was represented that a so-called "Stipulation of Fact" existed and had been filed along with the parties' pre-trial material. The file contained a document captioned "Stipulations", which had been filed by plaintiffs, and it contained the signatures of counsel for MOPAC and KATY only. It did not contain the signature of any representative of UTU. It was not until February 6, 1984, that this Court received and filed a copy of the "Stipulations" with a signature of counsel for UTU on it. However, even this document does not contain the signature of KATY's counsel. This Court assumes that, given the fact that counsel for KATY's signature appears on a copy of this document elsewhere in the file, it is a valid and binding stipulation of fact.

Commission ("ICC"). MOPAC offers rail freight transportation over 11,500 miles of railroad; its principal north-south lines extend to Louisiana and Texas from Chicago via St. Louis and from Omaha via Kansas City.[3]

2. Intervenor KATY is a common carrier regulated by the ICC. KATY offers rail freight transportation over 2,100 miles of railroad; its major lines serve San Antonio, Houston and Galveston. Until January, 1983, the northern-most points served by KATY were St. Louis and Kansas City.

3. Defendant UTU is a railway labor organization duly authorized, under the Railway Labor Act, 45 U.S.C. § 151, *et seq.*, to represent certain employees of MOPAC and KATY who are members of the crafts or classes of conductors, brakemen, yardmen, firemen, hostlers and helpers. All other defendants are agents and officials of UTU and/or the General Committee of Adjustment for MOPAC.

4. MOPAC has several agreements with UTU that govern certain rates of pay, rules and working conditions of UTU members employed by MOPAC. One agreement, last rewritten December 1,1982, applies to the crafts or classes of locomotive firemen, hostlers and hostler helpers; a second agreement, last rewritten September 1, 1979, applies to the crafts or classes of conductors, trainmen and yardmen.

5. On September 15, 1980, UPRR and MOPAC submitted to the ICC applications for approval of their proposed consolidation. These applications were submitted pursuant to the Interstate Commerce Act, 49 U.S.C. § 11344. From March, 1981, until January, 1982, the ICC held extensive hearings on these applications.

6. UTU participated in the ICC proceedings, opposing the applications and seeking conditions that would protect railroad employees affected by the transportations. KATY participated in the proceedings and opposed the consolidation; alternatively, if the consolidation were approved, KATY

sought "trackage rights" that would allow it to operate over MOPAC tracks between, among other points, Kansas City, on the one hand, and Council Bluffs, Iowa, Omaha, Union, Lincoln and Atchison, Nebraska, and Topeka, Kansas, on the other hand. *See* ICC Finance Docket 30,000 (Sub-No. 25). MOPAC opposed the trackage rights condition sought by KATY. The trackage rights application of KATY was filed in January of 1981 and the proposed trackage rights agreement included therein provided: "MKT, with its own employees, at its sole cost and expense, *shall* operate its engines, cars and trains on and along Joint Track." *See* F.D. No. 30,000 (Sub-No. 8) *et al.* (October 19, 1983), at 8 (emphasis added).

7. By decision and order dated October 20, 1982, the ICC approved the consolidation of UPRR and MOPAC, as well as the application of KATY for trackage rights, over MOPAC lines between Kansas City, on the one hand, and Council Bluffs, Iowa, Omaha, Union, Lincoln and Atchison, Nebraska, and Topeka, Kansas, on the other hand. *Union Pacific Corp., et al.—Control—Missouri Pacific Corp.*, 366 I.C.C. 459, 642, 653 (1982); *pet. for rev. pending*, D.C.Cir. Nos. 82–2253, *et al.* The ICC's Order provided that the trackage rights, which it concluded were necessary to ameliorate competitive effects of the approved consolidation, would be effective immediately upon consummation of the consolidation. The ICC's Order did not specify compensation terms, but allowed the parties to negotiate such terms. In a recent decision of the ICC, Finance Docket No. 30,000 (Sub-No. 25), the ICC recognized that it has plenary authority to impose such trackage rights under the Interstate Commerce Act, 49 U.S.C. § 11341, *et seq.*

8. The ICC's Order approving the trackage rights requested by KATY in F.D. 30,000 (Sub-No. 25) provided that the trackage authority was "subject to employee protective conditions to the extent specified

---

**3.** Paragraphs 1 through 13 of these "Findings of Fact" are substantially verbatim portions of the "Stipulation" signed by the parties. MOPAC is sometimes referred to as "MPRR" or "MP" and KATY is sometimes referred to as "MKT".

in *Norfolk and Western Ry. Co.-Trackage Rights-BN*, 354 I.C.C. 605 (1978), as modified by *Mendocino Coast Ry., Inc.-Lease and Operate*, 360 I.C.C. 653, 664 (1980)." 366 I.C.C. at 654 (¶ 19). These conditions are commonly referred to in the railroad industry as the "Norfolk and Western" conditions (hereinafter "N & W").

9. On November 9, 1982, UPRR, MO-PAC and KATY filed with the ICC a "Stipulation" reflecting their agreements in principle on the terms and conditions of the anticipated trackage rights operations (other than permanent compensation terms). The Stipulation provided that "the parties will enter into a standard form trackage rights agreement to implement KATY's trackage rights."

10. The consolidation of UPRR and MO-PAC was effected on December 22, 1982. By letter dated December 31, 1982, MO-PAC advised the General Chairman of UTU, among others, that KATY was expected to initiate trackage rights operations on January 3, 1983, and that "[n]o Missouri Pacific employees will be adversely affected as a result of the utilization of these trackage rights ...." In response, R.D. Hogan of UTU sent a letter dated January 4, 1983, to O.B. Sayers of MOPAC, which stated in part:

> The Katy Railroad has no terminals north of Kansas City, Missouri and prior to this time has not handled any service beyond that point. This service has traditionally been handled by the employees we represent on the Missouri Pacific (Proper) Railroad, and it is our position that any and all service operated northward on Missouri Pacific tracks out of Kansas City, Missouri be protected by Missouri Pacific (Proper) road crews. Request is hereby made that such service be protected as indicated above.

11. On January 5, April 11 and April 13, 1983, the KATY entered into separate agreements with representatives (the UTU) of its engine and train service employees concerning the implementation of the trackage rights over MOPAC's track as authorized in Finance Docket 30,000 (Sub-No. 25).

12. KATY, using KATY employees, initiated operations over the trackage rights on or about January 6, 1983. KATY is presently using its own employees to pickup and set-out rail cars at Atchison and Union, Nebraska and at Council Bluffs, Iowa.

13. The formal terms and conditions (other than the terms of the compensation owed MOPAC for KATY's trackage rights) are set forth in a standard form trackage rights agreement filed with the ICC March 9, 1983 ("the Trackage Rights Agreement"). The Trackage Rights Agreement recognizes that KATY "shall, with its own employees, at its sole cost and expense, operate its trains, locomotives and cars over" MOPAC's Omaha-Kansas City line.

14. By Mailgram dated March 28, 1983, and directed to MOPAC, UTU officials Newcomb and Hogan stated, as follows:

> The undersigned representing conductors, road brakemen, yardmen, firemen, hostlers, and hostler helpers on the Missouri Pacific (proper) have exhausted our patience and goodwill in attempting to have you stop the use of MKT employees manning freight trains over Missouri Pacific lines between Kansas City and Omaha. This will serve as notice that if arrangements are not made to halt this trespass on our collectively bargained agreements and our seniority by non-Missouri Pacific employees, the employees under the jurisdiction of our committees will peacefully withdraw from service on those parts of the Missouri Pacific Railroad under our jurisdiction at 12:01 AM April the 4th 1983.

15. On March 30, 1983, MOPAC filed its complaint, against the UTU and several of its officers, under the Railway Labor Act, 45 U.S.C. § 151 *et seq.*, and the Interstate Commerce Act, 49 U.S.C. § 11341 *et seq.*, seeking declaratory and injunctive relief against the threatened strike. On the same day this Court granted a Temporary Restraining Order prohibiting defendants from engaging in any strike or related ac-

tivities against plaintiff. Thereafter, KATY intervened as a plaintiff and joined in MOPAC's request for relief. The UTU also filed a counterclaim against MOPAC and KATY alleging, in two (2) counts, that MOPAC violated the Railway Labor Act and that MOPAC and KATY violated the terms of the ICC's Order approving the application of KATY for trackage rights. The Temporary Restraining Order was extended beyond the ten (10) day limit of Rule 65(b), *Fed.R.Civ.P.* 65(b), several times by agreement of the parties. The last such extension expired at 10:00 A.M. on February 7, 1984.

16. MOPAC has numerous trackage rights arrangements whereby other carriers, including KATY, operate over its lines and whereby MOPAC operates over the lines of other carriers, including KATY.

17. Article 1, § 4 of the N & W conditions provides, in pertinent part, as follows:

When the railroads contemplate a transaction, they shall give at least twenty (20) days' written notice of such intended transaction . . . .

At the request of either railroad or representatives of such interested employees, negotiations for the purpose of reaching agreement with respect to application of the [N & W conditions] shall commence immediately and continue for not more than twenty (20) days from the date of notice. Each transaction which will result in a dismissal or displacement of employees or rearrangement of forces, shall provide for the selection of forces from all employees involved on basis accepted as appropriate for application in the particular case and any assignment of employees made necessary by the transaction shall be made on the basis of an agreement or decision under this section 4.

354 I.C.C. at 610–611. With respect to KATY's trackage rights over MOPAC lines, neither MOPAC nor KATY gave the notice called for by Art. I, § 4, to MOPAC employees. However, several conferences concerning the grant of trackage rights to KATY were held between, *inter alia*, Irv-

ing Newcomb for UTU and O.B. Sayers for MOPAC. These conferences occurred between January 4, 1983, and March 28, 1983. According to Mr. Newcomb, at a conference held on March 7, 1983:

[T]he UTU requested MoPac to negotiate with the UTU regarding (1) the transfers to MKT of the right to operate over MoPac tracks to perform work previously performed by MoPac operating employees, and (2) the effects of such a transfer of operating rights on MoPac employees represented by UTU.

*Aff. of I. Newcomb,* ¶ 3. Mr. Newcomb states that MOPAC refused this request, relying upon actions and orders of the ICC. *Id.*

18. On May 12, 1983, the ICC issued a decision denying the petition of the Brotherhood of Locomotive Engineers (hereinafter "BLE") for clarification of the ICC's decision approving the consolidation of UPRR and MOPAC. F.D. No. 30,000 (Sub-No. 18) *et al.* (May 12, 1983). The ICC summarized the position of BLE, as follows:

BLE seeks to have the consolidation decision clarified with respect to whether MKT . . . may use their own operating crews in performing trackage rights operations over MP lines. It asserts that this commission has no jurisdiction over crew assignment matters and that our decision should not be construed as authorizing MKT . . . to use their own crews in the performance of the approved operations. It indicates that these matters are subject to settlement in accordance with the Railway Labor Act and are not within the scope of our decision approving the responsive trackage rights applications.

*Id.* at 2–3. In denying BLE's petition the ICC stated:

Inasmuch as . . . MKT proposed in [its] applications that the operations would be performed with [its] own crews, our approval of the applications authorizes such operations. Our decisions of November 24, 1982, and January 18, 1983, unambiguously specified that trackage rights ten-

ants may perform operations using their own crews.

*Id.* at 4. Moreover, the ICC added:

We have broad authority to impose conditions on consolidations and our jurisdiction is plenary. Therefore, we properly authorized performance of trackage rights tenants using their own crews.

*Id.* at 5.

19. On June 16, 1983, UTU sent a letter to several carriers, including MOPAC and KATY, requesting that those carriers "comply fully with [the] advance notice and negotiation requirements" of Art. I, § 4 of the N & W conditions.

20. MOPAC rejected UTU's request in a letter dated June 23, 1983. MOPAC interpreted UTU's letter as a request to enter into negotiations aimed at reaching a "single implementing agreement" with respect to the selection of forces for trackage rights tenants. MOPAC, relying on the May 18, 1983, order of the ICC which "confirm[ed] the inability of MPRR and UPRR to bind their trackage rights tenants to an agreement regarding selection of forces", stated that "it would be inappropriate and unproductive for MPRR and UPRR to participate in" a meeting or negotiations aimed at reaching such an agreement. However, MOPAC's letter did express a willingness to negotiate with UTU "issues of mutual interest arising from the recently approved consolidations ...."

21. KATY responded to the UTU in a letter dated June 22, 1983. KATY also rejected the UTU's request, relying on the ICC's orders and the fact that it had already met and negotiated implementing agreements with its own employees who are represented by the UTU.

22. On June 29, 1983, the UTU filed a pleading with the ICC which sought reconsideration of the ICC's May 18, 1983, denial of the petition for reconsideration. In that pleading the UTU asked the ICC to rule:

[T]hat its prior orders (1) did not select the forces to perform the trackage rights operations, (2) did not relieve the carriers of their obligations under the Railway Labor Act to avoid unilateral changes of working conditions, and (3) did not relieve the carriers of their obligations to comply with the notice and negotiation provisions of the employee protective provisions imposed in the sub-proceedings at bar to protect the interests of MP employees affected by those transactions.

23. The ICC rejected *all three* of the UTU's arguments in a decision dated October 19, 1983. F.D. No. 30,000 (Sub-No. 18) *et al.* (October 19, 1983). The ICC stated:

Petitioners contend that UP–MP employees, through their bargaining agents, have the right to participate in the trackage rights crew selection process and have the right to have any related disputes resolved pursuant to the RLA and the applicable labor protective conditions. We find these arguments to be unpersuasive and unsupported by the record in these proceedings.

*Id.* at 4–5. The ICC further concluded that:

Provisions of trackage rights agreements designating which carrier's employees will perform trackage rights operations are material terms of the agreement and may be implemented without any other approval. Further, the agreement is exempted from any requirements of law that could frustrate implementation of the trackage rights agreement as approved, including the crew assignment provision.

24. The strike threatened by UTU will cause a disruption of service to MOPAC and its shippers, and result in severe, immediate and irreparable injury to MOPAC. MOPAC, which operates over 3,400 trains per week, carrying 2,300,000 tons of freight, would be placed in serious jeopardy by the threatened strike. The injury to MOPAC's thousands of shippers, especially those exclusively served by MOPAC, would be irreparable. *Aff. of O.B. Sayers,* ¶ 4.

**B. CONCLUSIONS OF LAW**

**1. INTRODUCTION**

This action arises under the Railway Labor Act (RLA), 45 U.S.C. § 151 *et seq.,* and

the Interstate Commerce Act, 49 U.S.C. § 11341 *et seq.* This Court has subject matter jurisdiction under 28 U.S.C. § 1331(a) and 1337.

Plaintiff and plaintiff-intervenor's complaints seek preliminary and permanent injunctive relief against defendants' threatened strike. Plaintiffs contend in their complaints that the dispute which gives rise to this action concerns the interpretation and application of the collective bargaining agreements between MOPAC and UTU. According to plaintiffs, the dispute is therefore a "minor" dispute within the meaning of the RLA and defendants are required by § 153 of the RLA to submit the dispute to the exclusive jurisdiction of the National Railway Adjustment Board (NRAB) rather than strike. Plaintiffs also allege that defendants' strike would violate § 152, First of the RLA, which requires carriers and employee representatives to exert every reasonable effort to settle disputes, because defendants failed to invoke the binding arbitration provisions of the employee protective conditions that were imposed by the ICC. *See Finding of Fact No. 8.* Additionally, plaintiffs contend that defendants' proposed strike action is barred by the doctrines of estoppel, collateral estoppel, and res judicata.[4]

Defendants counterclaimed for declaratory and injunctive relief. In Count I of their counterclaim defendants allege that MOPAC violated § 156 of the RLA by unilaterally changing the actual and objective working conditions of its employees, i.e., by authorizing KATY to operate over MOPAC tracks with KATY crews, without complying with the notice and negotiation requirements of § 156. In Count II defendants allege that both MOPAC and KATY violated Article 1, §§ 2 and 4 of the N & W conditions imposed by the ICC, *see Finding of Fact No. 8,* by not preserving working conditions that prevailed prior to the transaction (Art. 1, § 2), and by failing to give

twenty (20) days prior notice and to negotiate over the selection of forces to operate the trackage rights (Art. 1, § 4). Defendants seek an injunction requiring plaintiffs to restore the status quo that existed prior to the trackage rights transfer, prohibiting trackage rights operations until plaintiffs comply with Article 1, section 4 of the N & W conditions, and making all employees whole for their losses due to plaintiffs' alleged infractions.

Plaintiffs' motion for a preliminary injunction against defendants' proposed strike presents a unique and complex problem. The decision whether to enjoin defendants' threatened strike requires this Court to reconcile several federal statutes: 1) the Norris-LaGuardia Act (hereinafter the "NLGA"), 29 U.S.C. § 101 *et seq.;* 2) the Railway Labor Act (hereinafter the "RLA"), 45 U.S.C. § 151 *et seq.;* and 3) the Interstate Commerce Act (hereinafter the "ICA"), 49 U.S.C. § 11341 *et seq.* Essentially, defendants argue that the NLGA deprives this Court of the power to issue an injunction against defendants' threatened labor strike. Because this Court declines to read the NLGA in a vacuum, defendants' argument must be rejected. This Court will first address the NLGA problem and then will analyze the four (4) traditional criteria for determining whether preliminary injunctive relief is warranted.

### 2. DOES THE NORRIS–LaGUARDIA ACT BAR A LABOR INJUNCTION IN THIS CASE?

Section 104 of the NLGA provides:

No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute ... from doing, whether singly or in concert, any of the following acts:

---

**4.** This Court declines to express an opinion as to the merits of these claims. The record on these questions is not adequate to make any findings concerning the collateral estoppel or res judicata effect of the ICC proceedings in the case at

bar. The same is true of the estoppel and bar claim. Moreover, this Court's disposition of plaintiffs' other claims herein makes it unnecessary for this Court to determine these questions at this time.

(a) Ceasing or refusing to perform any work or to remain in any relation of employment; . . . .

29 U.S.C. § 104. In addition, § 108 of the NLGA provides:

No restraining order or injunctive relief shall be granted to any complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration.

29 U.S.C. § 108. Defendants contend that § 104 deprives this Court of jurisdiction to enjoin defendants' threatened strike. Alternatively, defendants argue that if this Court does have jurisdiction to enjoin defendants' threatened strike, then injunctive relief must be denied because plaintiffs have not met the requirements of § 108.

Plaintiffs respond that the underlying labor dispute is a "minor" dispute within the meaning of the RLA and, therefore, the NLGA is no bar to the power of this Court to enjoin defendants' threatened strike. Alternatively, plaintiffs argue that if the underlying labor dispute is a "major" dispute within the meaning of the RLA, then plaintiffs are exempt, under the ICA, from any duty to negotiate with defendants concerning crew selection for KATY's trackage rights and the NLGA must give way to the power and jurisdiction of the ICC in this situation. Plaintiffs do not specifically address defendants' § 108 argument.

As stated in this Court's order of February 7, 1984, and as explained more fully below, this Court holds that: 1) this is a "minor" dispute within the meaning of the RLA and, therefore, § 104 of the NLGA does not bar a labor injunction; 2) alternatively, if this is a "major" dispute within the meaning of the RLA, defendants' proposed strike would be illegal because plaintiffs have no duty to negotiate with defendants concerning crew selection for KATY's trackage rights, and § 104 of the NLGA must give way to the ICC's power to deter-

mine labor disputes in connection with consolidation and trackage rights proceedings; and 3) § 108 of the NLGA does not prevent the issuance of a preliminary injunction because plaintiffs have not violated its provisions. Each of these three (3) will be discussed in turn below.

### a. THIS IS A "MINOR" DISPUTE AND THE NORRIS-LaGUARDIA ACT DOES NOT BAR A LABOR INJUNCTION

The RLA, which governs labor relations in the railroad industry, draws a significant distinction between "minor" disputes and "major" disputes. In an often-quoted passage, the Supreme Court described the distinction, as follows:

[Major disputes] relate . . . to disputes over the formation of collective bargaining agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.

[Minor disputes], however, contemplate . . . the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case. . . . In either case the claim is to rights accrued, not merely to have ones created for the future.

*Elgin, Joliet & Eastern Railway Co. v. Burley,* 325 U.S. 711, 723, 65 S.Ct. 1282, 1290, 89 L.Ed. 1886 (1945). *See also Brotherhood of Railroad Trainmen v. Chicago River & Indiana Railroad Co.,* 353 U.S. 30, 33, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957); *Chicago and Northwestern Transportation Co. v. United Transportation Union,* 656 F.2d 274, 277–78 (7th Cir.1981); *International Brotherhood of Teamsters, etc. v. Braniff International Airways,*

*Inc.*, 437 F.2d 1272, 1274 (5th Cir.1971). The distinction between the two types of disputes is significant because it affects the procedure for settling disputes and the applicability of the NLGA's prohibition against federal court labor injunctions.

■ If a dispute is a "minor" dispute and it cannot be resolved by the normal grievance procedure, then the parties must submit their differences to the NRAB, the jurisdiction of which is exclusive. *Andrews v. Louisville & Nashville Railroad Co.*, 406 U.S. 320, 92 S.Ct. 1562, 32 L.Ed.2d 95 (1972); *Chicago and Northwestern Transportation Co.*, 656 F.2d at 277. For this reason, a strike over "minor" disputes violates the RLA and may be enjoined by a federal district court, the prohibitions of the NLGA notwithstanding. *Locomotive Engineers v. Louisville & Nashville Railroad Co.*, 373 U.S. 33, 83 S.Ct. 1059, 10 L.Ed.2d 172 (1963); *Chicago River*, 353 U.S. at 40–42, 77 S.Ct. at 640–641; *Chicago and Northwestern Transportation Co.*, 656 F.2d at 277. On the other hand, "[i]f the dispute is 'major', . . . the union may strike to secure its position if after negotiation between the parties, mediation by the National Mediation Board, and, possibly, a review and report by an emergency board appointed by the President, a settlement is not reached." *Chicago and Northwestern Transportation Co.*, 656 F.2d at 277. *See also Order of Railroad Telegraphers v. Chicago & North Western Railway Co.*, 314 F.2d 424, 431 (8th Cir.), *cert. denied*, 375 U.S. 819, 84 S.Ct. 55, 11 L.Ed.2d 53 (1963).

Strikes over "minor" disputes may be enjoined despite the NLGA, because such strikes violate the mandate of the RLA that such disputes be conclusively resolved through the NRAB machinery created by the RLA. In *Chicago River* the Supreme Court held that the earlier and general provisions of the NLGA must be accommodated to the later and more specific provisions of the RLA. 353 U.S. at 40–42, 77 S.Ct. at 640–641. The Court also explained that the NLGA prevents the issuance of an injunction against a railway labor strike over a "major" dispute, because the RLA "does not provide a process for a final decision like that of the Adjustment Board in a 'minor dispute' case." *Id.* at 42 n. 24, 77 S.Ct. at 641 n. 24.

■ In the case at bar the underlying labor dispute is a "minor" dispute. The essential test is whether the dispute "evolv[es] from the bargaining process for a new or altered contract," or whether the dispute is "over the meaning of an existing collective bargaining agreement." *Id.* Here, the strike threat mailgram from UTU is the best indication that the dispute is the latter rather than the former. UTU's mailgram demanded a halt to MOPAC's "trespass on our collectively bargained agreements and our seniority." *Finding of Fact No. 14.* UTU's reliance on the collective bargaining agreements and the seniority provisions therein lead to the conclusion that the dispute is arguably and reasonably susceptible to resolution by reference to the contracts between the parties. *Independent Federation of Flight Attendants v. Trans World Airlines, Inc.*, 655 F.2d 155, 158–59 (8th Cir.1981); *United Transportation Union v. Burlington Northern, Inc.*, 458 F.2d 354, 357 (8th Cir. 1972); *International Brotherhood of Teamsters, etc. v. Braniff International Airways, Inc.*, 437 F.2d 1272, 1274 (5th Cir.1971).

UTU argues that the reference in the mailgram to the exhaustion of UTU's "patience and goodwill in attempting to have [MOPAC] stop the use of MKT employees" on KATY trains running over MOPAC lines, makes this a "major" dispute. *Finding of Fact No. 14.* UTU contends that this refers to efforts to negotiate a new contract or to change the existing collective bargaining agreement. However, the language relied upon is ambiguous at best and does not deviate from the basic position of UTU expressed in the mailgram—that MOPAC is breaching the collective bargaining agreements *currently in effect* by allowing KATY employees to operate KATY's trackage rights over MOPAC lines. The language relied upon by UTU does not con-

vince this Court that what UTU was actually trying to do was to bargain for a new or altered contract.

■ UTU next argues that the allegations in its counterclaim make this a "major" dispute. In ¶ 9 of UTU's counterclaim against MOPAC, UTU alleges that an "actual and objective working condition" of the relationship between MOPAC and UTU was that trains operating over MOPAC tracks or serving customers on those tracks be manned by MOPAC crews. UTU further alleges that MOPAC unilaterally changed that working condition by allowing KATY crews to operate KATY trains on MOPAC lines. *Counterclaim ¶ 14.* The UTU contends that this creates a "major" dispute because MOPAC violated § 152, Seventh[5] and § 156[6] of the RLA by making such changes without following the procedure in § 156. 45 U.S.C. § 152, Seventh; § 156.

The law is clear that a change in "working conditions" which violates § 152, Seventh and § 156, is a "major" dispute where the contract involved is not "reasonably susceptible" to an interpretation that the change is justified or permitted by the contract. *Trans World Airlines,* 655 F.2d at 157–59. *See also Burlington Northern,* 458 F.2d at 357; *Braniff International Airways,* 437 F.2d at 1274. However, this rule is not applicable here, where the ICC's approval of the trackage rights arrangement exempts MOPAC from its duty under § 152, Seventh and § 156, at least with respect to the crewing provisions of the trackage rights agreement.

**5.** 45 U.S.C. § 152, Seventh, provides:
Seventh. No carrier, its officers, or agents shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or in section 156 of this title.

**6.** 45 U.S.C. § 156, provides:
Carriers and representatives of the employees shall give at least thirty days' written notice of an intended (change in agreements) affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of

■ The ICC's exemption power is found in § 11341(a) of the Interstate Commerce Act, which provides, in pertinent part:

The authority of the Interstate Commerce Commission under this subchapter is exclusive.... A carrier, corporation, or person participating in [an] approved or exempted transaction *is exempt* from the antitrust law and *from all other law,* including State and municipal law, *as necessary to let that person carry out the transaction,* hold, maintain, and operate property, and exercise control or franchises acquired through the transaction.

49 U.S.C. § 11341(a). The exemption provided by § 11341(a) is self-executing, *Chicago and Northwestern Railway Co.,* 314 F.2d at 432, but here the ICC twice made it clear that MOPAC and KATY are exempt from any requirements of the RLA concerning the crew selection clause in the approved trackage rights agreement. *See Findings of Fact Nos. 18, 22, 23. See Chicago & North Western Railway Co.,* 314 F.2d at 431–32 (no express or implied exception of RLA provisions from ICC exemption power).

■ It is the opinion of this Court that § 11341(a) exempts MOPAC from any duty under RLA § 152, Seventh or § 156 concerning the use of KATY employees on MOPAC lines. *See also Part I, 2, b, infra.* UTU argues that this Court must make a *de novo* determination of whether such an exemption is "necessary to let [MOPAC] carry out the transaction...." 49 U.S.C. § 11341(a). Although such a determination

said notice, and said time shall be within the thirty days provided in the notice. In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon, as required by section 155 of this title, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board.

may be necessary where the ICC has failed to expressly make any findings concerning exemption, *see Chicago and Northwestern Railway Co.*, 314 F.2d at 432, it is not necessary here where the ICC has expressly relieved MOPAC from the obligations of the RLA. To the extent the UTU challenges this action of the ICC, it may not do so in this forum. The United States Courts of Appeals are vested with exclusive jurisdiction to determine the validity of orders of the ICC. 28 U.S.C. § 2342. UTU's reliance on *Texas and New Orleans Railroad Company v. Brotherhood of Railroad Trainmen*, 307 F.2d 151 (5th Cir. 1962), *cert. denied*, 371 U.S. 952, 83 S.Ct. 508, 9 L.Ed.2d 500 (1963), *reh. denied*, 375 U.S. 871, 84 S.Ct. 28, 11 L.Ed.2d 101 (1963), is misplaced, because in that case there was no express finding by the ICC that the provisions of the RLA should be exempted. Moreover, to the extent that *Texas and New Orleans Railroad* stands for the proposition that § 11341(a) cannot operate to relieve a carrier of its obligations under the RLA, this Court respectfully rejects that proposition.

■ Finally, UTU argues that this dispute cannot be considered a "minor" dispute, because if MOPAC is exempt from the requirements of the RLA, then MOPAC cannot be required to submit this dispute to a final and binding decision by the NRAB. More importantly, UTU argues that because MOPAC need not submit the dispute to the NRAB, the rationale for excepting strikes over "minor" disputes from the prohibitions of the NLGA is absent, and, therefore, the NLGA applies to prohibit an injunction against the threatened strike. This is an interesting argument, but it is the opinion of this Court that, assuming MOPAC is exempt from the RLA requirement that "minor" disputes be submitted to the NRAB, it does not follow that the rationale for excepting "minor" disputes from the prohibitions of the NLGA is absent.

The rationale is not absent, because the ICA provides "a process for a final decision," *Chicago River*, 353 U.S. at 42 n. 24, 77 S.Ct. at 641 n. 24, and here the ICC rendered a final decision as to the validity of KATY's use of KATY employees to operate its trackage rights. In *Chicago and North Western Railway Co.*, the Eighth Circuit made it clear that the ICC has jurisdiction to determine labor disputes, whether "minor" or "major", in connection with its power to approve mergers and consolidations. 314 F.2d at 431. Here the ICC resolved the crew selection question against UTU, and to that extent the jurisdiction of the NRAB is displaced. Just as the NLGA is excepted to enforce the labor jurisdiction of the NRAB, in this case the NLGA is excepted to enforce the labor jurisdiction of the ICC.[7]

In sum, this is a "minor" dispute and § 104 of the NLGA does not deprive this Court of jurisdiction to enjoin defendants' threatened strike.

b. **EVEN IF THIS IS A "MAJOR" DISPUTE, THE PROHIBITIONS OF THE NORRIS–LaGUARDIA ACT ARE DISPLACED BY THE POWER AND JURISDICTION OF THE ICC UNDER THE INTERSTATE COMMERCE ACT**

This Court finds it necessary to rest this Court's conclusion that the NLGA does not prevent an injunction against UTU's threatened strike from issuing, upon an alternative basis: Even if this is a "major" dispute, MOPAC was exempted from any RLA duty to negotiate over the selection of crews and the NLGA must give way to protect the integrity of the jurisdiction and orders of the ICC under the ICA.

■ As discussed *supra*, it is the opinion of this Court that MOPAC is exempted under § 11341(a) of the ICA, 49 U.S.C. § 11341(a), from the requirements of the RLA with respect to "major" disputes. RLA § 156 imposes a duty on carri-

---

**7.** It may be argued that the analogy between the NRAB jurisdiction over "minor" labor disputes and the ICC jurisdiction over labor disputes is not perfect as it relates to the NLGA, because

the ICA was not "adopted as a part of a pattern of labor legislation." *Chicago River*, 353 U.S. at 42, 77 S.Ct. at 641. This argument is dealt with in section b, *infra*.

ers to negotiate over certain "major" disputes. 45 U.S.C. § 156. It is easy to see why it is necessary that MOPAC be exempted from that duty, insofar as it relates to UTU's demand that MOPAC negotiate over the selection of forces to operate KATY trains on MOPAC lines. There is nothing that UTU/MOPAC negotiations could do to change the crew selection provisions approved by the ICC. Under the ICA the ICC has authority to approve transactions, including trackage rights agreements, between carriers. 49 U.S.C. § 11341 *et seq.* Here the ICC expressly and emphatically stated that "[p]rovisions of trackage rights agreements designating which carrier's employees will perform trackage rights operations are material terms of the agreement and *may be implemented without further approval.*" F.D. No. 30,000 (Sub-No. 18) *et al.,* (October 19, 1983), at 15 (emphasis added). *See Finding of Fact No. 23.* MOPAC cannot unilaterally change a material term of a trackage rights agreement approved by the ICC and therefore MOPAC was immune from any requirement of the RLA to negotiate over such a material term.[8] *Norfolk & Western Railroad Co. v. Nemitz,* 404 U.S. 37, 92 S.Ct. 185, 30 L.Ed.2d 198 (1971). Nevertheless, UTU argues that it is still free to strike MOPAC over its refusal to negotiate about the selection of forces for KATY trains operating on MOPAC lines.

 The authority of the ICC in consolidation and trackage rights proceedings is plenary and exclusive. 49 U.S.C. § 11341(a); *Chicago & North Western Railway Co.,* 314 F.2d at 431. In *Chicago & North Western Railway Co.,* the Eighth Circuit held that this power includes jurisdiction to prescribe the method for determining the solution of labor problems arising directly out of approved mergers. *Id.*

There the union argued that it had a right to strike over five jobs which were being eliminated, and other seniority problems, pursuant to an ICC-approved merger. The issue in that case was whether disputes arising from the merger must be resolved according to the procedures of the RLA or the arbitration provisions of the ICC order approving the consolidation in question. In affirming the district court's ruling that the ICC order controlled and that the RLA procedures were inapplicable, the Court of Appeals extensively discussed the relationship between the jurisdiction of the ICC over consolidations and the rights of employees affected thereby. *Id.* at 427–33.

The *Chicago & North Western Railway Co.* Court held that the ICC has the right to make provisions, in approving consolidations, that conflict with existing collective bargaining agreements and RLA procedures. *Id.* at 427. The Court found the "major"/"minor" analysis inapplicable because the RLA had been exempted by the ICC. *Id.* at 429. Accordingly, the ICC had the power to authorize changes in working conditions and to resolve conflicting seniority rights free from the constraints of the RLA. *Id.*

Moreover, the Court found support for its conclusion in the legislative history of the ICA. The Court pointed out that the Harrington amendment to the ICA, which would have brought about a freeze of existing employees in their job rights and thereby would have threatened to prevent all consolidations, *id.* at 430, was defeated. The Court concluded that Congress intended the jurisdiction of the ICC to displace RLA procedures in merger-related disputes:

> Thus under the Railway Labor Act provisions, it is possible for either party to

---

**8.** UTU argues that § 11347, 49 U.S.C. § 11347, which provides that "[n]otwithstanding this subtitle, the arrangements [to impose employee protective conditions] may be made by the rail carrier and the authorized representative of its employees," authorizes MOPAC and UTU to negotiate over the crew selection issue. However, the crew selection clause in the trackage rights agreement is a material term of the agreement

which the ICC approved and is not one of the employees protective conditions that may be altered by the carrier and the employee representative. Moreover, the use of the term "may" in the provision relied upon by UTU suggests that it is permissive rather than mandatory. Therefore, MOPAC does not have any *duty* to negotiate with UTU under that provision.

completely block any change in working conditions by refusing to agree to a change and refusing to arbitrate. Like the Harrington amendment, the Railway Labor Act, if it applied, would threaten to prevent many consolidations.

*Id.* at 431. Several years later the Eighth Circuit read *Chicago & North Western Railway Co.* as holding that "the employees did not have a right to strike over merger-related disputes." *General Committee of Adjustment v. Burlington Northern, Inc.,* 563 F.2d 1279, 1285 (8th Cir.1977).

UTU relies heavily[9] upon *Texas & New Orleans Railroad Co. v. Brotherhood of Railroad Trainmen,* 307 F.2d 151 (5th Cir. 1962). In that case the carrier had given the union notice, under RLA § 156, of an intended change in operation. The carrier had also applied for and received approval from the ICC to carry out the change, which approval imposed certain employee protective conditions. However, the union threatened to strike after the carrier put the approved changes into effect and the carrier then brought suit to enjoin the strike. The Court affirmed the district court's denial of an injunction and rejected all arguments that the NLGA was displaced by the provisions of the ICA.

First, the *Texas & New Orleans Railway Co.* Court rejected the argument that the exemption power of the ICC exempted the NLGA. The Court held:

This section [11341(a)] relieves the carriers of the restraints and limitations of other laws, but it does not, on its face, relieve them from the action of other parties, i.e., the union's economic threat of a strike. Further, Norris-LaGuardia could not be considered as a legal restraint or limitation on the carriers and their ability to carry out an approved transaction. It is directed not at the power of the carriers to do anything but to the power of the court to grant injunctive relief.

307 F.2d at 156. Second, the Court rejected the argument that the ICC's power to impose employee protective conditions under § 11347 of the ICA should be treated as an exception to the NLGA. The Court viewed such conditions as an imposition of duties on the carrier only and not as a prohibition against the union "from gaining further rights in the transaction through the use of its own economic power—the strike." 307 F.2d at 157. Finally, the Court rejected the argument that the NLGA must give way to the authority of the ICC to approve transactions. *Id.* at 159.

This Court disagrees with the result reached in *Texas & New Orleans Railway Co.* Although *Chicago & North Western Railway Co.* is not on point[10], it is the opinion of this Court that the underlying concern in *Chicago & North Western Railway Co.* warrants rejection of *Texas & New Orleans Railway Co.* In the *Chicago*

---

9. UTU also relies upon *Order of Railroad Telegraphers v. Chicago & North Western Railway Co.,* 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774 (1960). However, this Court finds *Order of Railroad Telegraphers* to be inapposite. There, the Court held that the NLGA prevented the district court from enjoining a strike by the Order of Railroad Telegraphers. The Order of Railroad Telegraphers sought to force the carrier to negotiate an amendment to the contract to prevent the dismissal of any employees as a result of the carrier's consolidation of several stations. The case is not apposite, however, because the ICC was not involved and had not issued any final orders governing the consolidation. Indeed, the carrier was seeking approval from several state agencies. The Court stated: "Nothing the union requested would require the railroad to violate any valid law or the valid order of any public agency." *Id.* at 340, 80 S.Ct.

at 767. Here, on the other hand, MOPAC would be violating a material term of the ICC's approval of the trackage rights agreement if it took any action to require the use of MOPAC employees on KATY trains operating its trackage rights.

10. There are two (2) problems with applying *Chicago & North Western Railway Co.* to this case. First, UTU's dispute is not covered by any of the arbitration provisions imposed by the ICC. *See N & W Conditions* Article 1, §§ 4, 11. *See also Finding of Fact No. 8.* Second, that case did not deal with the NLGA question. *Chicago & North Western Railway Co.* was a declaratory judgment action, rather than an action to obtain injunctive relief from a threatened strike. *See also Chicago & North Western Railway Co.,* 314 F.2d at 433.

*& North Western Railway Co.* case, the Court was concerned with the consequence of narrowly restricting the scope of the ICC's power—labor unions could effectively block many or all consolidations which are approved by the ICC. The Harrington amendment was rejected to avoid such a consequence and, therefore, the Court interpreted the ICC's jurisdiction broadly to displace the applicability of the RLA. Similarly, it is the opinion of this Court that the applicability of the NLGA must be displaced by the power of the ICC over transactions like the one here, in order to avoid consequences which Congress intended to prevent.

The Supreme Court has stated that it will constrict the NLGA's broad prohibitions "in narrowly defined situations where accommodation of that Act to specific congressional policy is necessary." *Jacksonville Bulk Terminals v. Longshoremen,* 457 U.S. 702, 720, 102 S.Ct. 2673, 2685, 73 L.Ed.2d 327 (1982). Congress gave the ICC exclusive and plenary authority to approve certain transactions which are in the public interest. In so doing, Congress specifically intended the ICC to authoritatively resolve labor disputes arising from rail consolidations "in order that economically desirable mergers not be obstructed." *International Assn. of Machinists and Aerospace Workers v. Northeast Airlines, Inc.,* 473 F.2d 549, 559 n. 15 (1st Cir.1972). The legislative history of the ICA evidences this intent. *Id.* Moreover, as the ICC stated in its October 19, 1983; decision:

> If our approval of a transaction did not include authority for the railroads to make necessary changes in working conditions, subject to payment of specified benefits, *our jurisdiction to approve transactions requiring changes of the working conditions of any employee would be substantially nullified.* Such

a result would be clearly contrary to congressional intent.

F.D. No. 30,000 (Sub-No. 18) *et al.,* (October 19, 1983) (emphasis added). *See Finding of Fact No. 23.*

■ In the case at bar the ICC authoritatively resolved the question of which employees may operate KATY's trains over MOPAC lines. The NLGA must be accommodated to this exercise of the ICC's power, because allowing UTU to strike would be tantamount to saying that UTU has carte blanche authority to frustrate and avoid a material term of a consolidation approved by the ICC. Congress did not intend that affected employees have such power to block consolidations which are in the public interest.

Although it is not for this Court to question the wisdom of Congress' action, in this case it is not difficult to see why Congress intended the NLGA to be inapplicable to ICC-resolved, consolidation-related labor disputes. In the case at bar, UTU and other labor representatives participated in the ICC proceedings. *See Finding of Fact No. 6.* UTU does not contend that it did not have adequate opportunities to object to any provision of the transaction, including the trackage rights agreement, or to seek favorable treatment. UTU either failed to object to the crewing provisions of KATY's trackage rights application or it did object and the ICC rejected its objection.[11] In either case, it is inconceivable that Congress intended that a labor union would be able to participate in ICC approval proceedings and then, if the union was dissatisfied with the result or a part thereof, strike a carrier to obtain the advantage it desired.

Moreover, it is not probable that Congress intended to allow UTU to strike where UTU's objective is to obtain an advantage which MOPAC is now unable to give—the right to operate KATY trains

---

**11.** Here, according to the ICC, UTU did not specifically object to the crewing provisions of the trackage rights agreement at any time during the approval proceedings. F.D. No. 30,000 (Sub-No. 18) *et al.,* (October 19, 1983) at 8–12. *See Finding of Fact No. 23. See also supra,* note

4. UTU disputes this finding, but it matters not because the question of whether UTU objected to the crewing provisions of the trackage rights agreement is not material to this Court's resolution of the NLGA problem.

that run over MOPAC lines. If MOPAC gave that right to any of its employees, MOPAC would breach its agreement with KATY and would vary a material term of an agreement approved by the ICC. If UTU obtained its objective by striking, wouldn't KATY employees then be free to strike to obtain the same advantage? To avoid the stifling effects that such economic power would have on any attempt to consolidate railroad operations, Congress vested the ICC with the authority to resolve such disputes during approval proceedings. Affected employees are not left out in the cold, because § 11347 requires the ICC to impose employee protective conditions. 49 U.S.C. § 11347. The balance and efficiency which Congress sought to achieve with this scheme would be essentially and materially frustrated if employees were free to strike.

This Court is aware that *dicta* in various Supreme Court decisions indicates that exceptions to the prohibitions of the NLGA will be found only where necessary to accommodate other Congressional objectives embodied in so-called "labor legislation". *Chicago River*, 353 U.S. at 42, 77 S.Ct. at 641. The ICA was not enacted "as a part of a pattern of labor legislation," *id.*, but because the ICC has jurisdiction over labor disputes in connection with consolidation proceedings, excepting the NLGA in the case at bar does not result in a great departure from established doctrine. Indeed, the following passage from *Chicago River* can be read as supporting the result reached by this Court:

> We hold that *the Norris-LaGuardia Act cannot be read alone in matters dealing with railway labor disputes.* There must be an accommodation of that statute and the Railway Labor Act so that the obvious purpose in the enactment of each is preserved.

353 U.S. at 40, 77 S.Ct. at 640 (emphasis added). Here, the NLGA must be accommodated to the ICA in order to preserve the obvious purpose of giving the ICC jurisdiction over railroad consolidation proceedings.

## c. MOPAC HAS NOT VIOLATED SECTION 108 OF THE NORRIS–LaGUARDIA ACT

■ One final argument of UTU is that even if § 104 of the NLGA is inapplicable here, injunctive relief is still not appropriate because MOPAC violated § 108 of the NLGA. UTU contends that MOPAC violated § 108 by failing to negotiate with UTU or submitting this dispute to the National Mediation Board or to voluntary arbitration. *See generally, Brotherhood of Railroad Trainmen, Enterprise Lodge No. 27 v. Toledo, Peoria & Western Railroad,* 321 U.S. 50, 64 S.Ct. 413, 88 L.Ed. 534 (1944).

UTU's argument must be rejected, however, because § 108 requires a complainant to "make every *reasonable* effort to settle" the dispute. 29 U.S.C. § 108 (emphasis added). In the case at bar the ICC conclusively determined that KATY may use its own employees on its own trains over MOPAC lines. Because the ICC conclusively determined the dispute in the case at bar, it would not be reasonable for MOPAC to negotiate, mediate or arbitrate with the UTU concerning the selection of forces to operate the trackage rights.

## d. SUMMARY

In sum, this Court holds that the anti-injunction provisions of the NLGA do not deprive this Court of jurisdiction to enjoin UTU's threatened strike. Two (2) alternative rationales support this holding: first, this is a "minor" dispute within the meaning of the RLA; and second, even if this is "major" dispute within the meaning of the RLA, § 104 of the NLGA is displaced to preserve the purposes and objectives of the ICC's jurisdiction over labor disputes in consolidation proceedings. In addition, this Court holds that MOPAC did not violate § 108 of the NLGA.

## 3. PRELIMINARY INJUNCTION CRITERIA

■ In *Dataphase Systems, Inc. v. C.L. Systems, Inc.,* 640 F.2d 109 (8th Cir. 1981), the Court identified the following four (4) factors which must be considered

by a district court in passing on a motion for a preliminary injunction:

(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.

*Id.* at 114. These four (4) criteria weigh in favor of granting preliminary injunctive relief against defendants' threatened strike.

First, it is clear that a strike by UTU against MOPAC is very likely to result in irreparable harm to MOPAC. *Finding of Fact No. 24.* UTU does not even attempt to contest this factor in its opposition to the motion.

On the second element, the balance between the threat of irreparable harm and the harm that will be inflicted on defendants if a preliminary injunction is granted, MOPAC suggests that the harm to UTU will be modest in view of two facts: 1) UTU has consented to a continuance of the temporary restraining order several times; and 2) the N & W Conditions provide UTU employees with adequate protection from the adverse effects of KATY employees operating the trackage rights. *See Findings of Fact Nos. 15, 8.* This Court agrees. The protective conditions provide adversely affected employees with displacement allowances, dismissal allowances and fringe benefits. Moreover, the trackage rights have been operated by KATY with KATY employees for over a year now. Any harm to UTU members has most likely already occurred. Any additional harm that might be caused by enjoining the threatened strike will not be irreparable.

The third factor, probability of success on the merits, is not a problem here. This Memorandum resolves UTU's primary defense, that this Court lacks jurisdiction to enjoin UTU's threatened strike, in favor of the carriers. *See supra.* Moreover, this Memorandum grants plaintiffs' motion for summary judgment on defendants' counterclaim, *see infra.* Therefore, success on the merits is likely.

Finally, the public interest in uninterrupted freight shipment weighs in favor of granting the motion. *See Finding of Fact No. 24.*

Accordingly, plaintiffs' motion for a preliminary injunction is granted.

## II MOTION TO REFER ISSUES TO INTERSTATE COMMERCE COMMISSION

Prior to the October 19, 1983, decision of the ICC, *see Finding of Fact No. 23,* UTU moved to refer two (2) issues to the ICC pursuant to 28 U.S.C. § 1336(b) and the doctrine of primary jurisdiction. *See United States v. Western Pacific Railroad Co.,* 352 U.S. 59, 63–65, 77 S.Ct. 161, 164–66, 1 L.Ed.2d 126 (1956); *Iowa Beef Processors, Inc. v. Illinois Central Gulf Railroad Co.,* 685 F.2d 255 (8th Cir.1982). UTU phrased these two (2) issues, as follows:

1. Did the ICC by its order in *Union Pacific—Control—Missouri Pacific; Western Pacific,* 366 I.C.C. 462 (1982), intend to exempt under 49 U.S.C. § 11341(a) the carriers involved in that transaction from the requirements of the Railway Labor Act, 45 U.S.C. § 151 *et seq.,* that they negotiate with rail labor those changes in rules and working conditions which may be required to implement the ICC's permissive authority?

2. Did the ICC by its order in *Union Pacific—Control—Missouri Pacific; Western Pacific,* 366 I.C.C. 462 (1982), require the Missouri Pacific Railroad (MoPac) and the Missouri-Kansas-Texas Railroad (MKT) both to give advance notice to all MoPac and MKT employees who might be affected by the implementation of the Trackage Rights granted in Finance Docket No. 30,000 (Sub-No. 25) and, if requested, to negotiate an implementing agreement with those employees?

*Motion of Defendants To Refer Issue To The Interstate Commerce Commission* at 1–2. Following the ICC's October 19, 1983, decision UTU admits that its motion to refer is moot as to issue # 1. However, it contends that its motion is not moot as to issue # 2. Plaintiffs argue that the ICC's

recent decisions also mooted the motion as to issue # 2.

Essentially, this Court must decide whether the ICC's orders determined issue # 2. UTU contends that the ICC's most recent order did not address the impact of Article 1, § 4 of the N & W Conditions, *see Finding of Fact No. 8,* and the right of UTU to require MOPAC to negotiate an implementing agreement with respect to the selection of forces problem. However, it is the opinion of this Court that the ICC's most recent decision makes it clear that the Article 1, § 4 requirement of notice and negotiation is inapplicable with respect to the selection of forces issue.

In its October 19, 1983, decision the ICC noted defendants' "notice and negotiation" argument, but rejected it. *See Findings of Fact Nos. 22, 23.* Moreover, the ICC held that UTU has *no* right to participate in the crew selection process and that MO-PAC/KATY could implement their trackage rights agreement without *any* other approval. *Finding of Fact No. 23.* Finally, the ICC's discussion concerning the interpretation of labor conditions imposed in connection with an approved transaction, further suggests that Article 1, § 4 is not applicable to the crew selection issue:

> [S]tandard labor protection conditions generally preserve working conditions and collective bargaining agreements. The terms of those conditions, however, must be read in conjunction with our decision authorizing the involved transaction and the underlying statutory scheme. To the extent that existing working conditions and collective bargaining agreements conflict with a transaction which we have approved, those conditions and agreements must give way to the implementation of the transaction. The labor conditions imposed under section 11347 preserve conditions and

agreements in the context of the authorized transaction.

F.D. No. 30,000 (Sub-No. 18) *et al.,* (October 19, 1983) at 6. Read in the context of the ICC's approval of the crew selection provisions of the trackage rights agreements, Article 1, § 4 is not applicable to that issue.[12] *See also Brotherhood of Maintenance of Way Employees v. Interstate Commerce Commission,* 698 F.2d 315, 317 n. 6 (7th Cir.1983) ("The adoption of standard conditions, routinely imposed, often results in incorporation of superfluous provisions having no application to the particular case under consideration.")

Arguably, a portion of issue # 2 was not decided by the ICC. The issue phrased by UTU is broad enough to cover the question of whether plaintiffs have any duty under Article 1, § 4 to give notice and negotiate an implementing agreement with respect to *issues other than the selection of forces. See Finding of Fact No. 17.* There is no need to refer this question to the ICC, however, because there does not seem to be any ambiguity about this question in the ICC's orders and because the central dispute between the parties, as evidenced by the positions of the parties taken in their memoranda, concerns the narrower question of plaintiffs' duty to negotiate about selection of forces.

Accordingly, UTU's motion is denied.

## III CROSS–MOTIONS FOR SUMMARY JUDGMENT ON PLAINTIFFS' COMPLAINT

■ Under Rule 56 of the Federal Rules of Civil Procedure, a movant is entitled to summary judgment if he can "show that there is no genuine issue as to any material fact and that [he] is entitled to a judgment as a matter of law." *Fed.R. Civ.P.* 56(c). *See also Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464,

---

**12.** Thus, as to plaintiffs' trackage rights agreement, the effect of the ICC's orders is that the following sentence is inapplicable:

> Each transaction which will result in a dismissal or displacement of employees or rearrangement of forces, shall provide for *the selection of forces* from all employees in-

volved on basis accepted as appropriate for application in the particular case and any assignment of employees made necessary by the transaction shall be made on the basis of an agreement or decision under this section 4.

*N & W Conditions,* Article 1, § 4 (emphasis added). *See Findings of Fact Nos. 8, 17.*

82 S.Ct. 486, 7 L.Ed.2d 458 (1962). In passing on a motion for summary judgment, a court is required to view the facts and inferences that may be derived therefrom in the light most favorable to the non-moving party. *Buller v. Buechler*, 706 F.2d 844, 846 (8th Cir.1983); *Vette Co. v. Aetna Casualty and Surety Co.*, 612 F.2d 1076, 1077 (8th Cir.1980). The burden of proof is on the moving party and a court should not grant a summary judgment motion unless it is convinced that there is no evidence to sustain a recovery under any circumstances. *Buller*, 706 F.2d at 846. However, under Rule 56(e), a party opposing a motion for summary judgment may not rest upon the allegations of his pleadings but "must set forth specific facts showing that there is a genuine issue for trial." *Fed.R.Civ.P.* 56(e). *See also* 10A Wright, Miller and Kane, *Federal Practice and Procedure: Civil 2d*, § 2739 (1983).

Plaintiffs moved for summary judgment on their complaint. Defendants filed a cross-motion for summary judgment. Plaintiffs argue that this is a "minor" dispute, that plaintiffs are exempt from the requirements of the RLA, and that this Court has jurisdiction to enjoin defendants' threatened strike. Defendants argue that this is a "major" dispute, that plaintiffs violated the RLA, and that sections 104 and 108 of the NLGA bar this Court from enjoining the strike.

It is obvious that this Memorandum determines several of the legal issues raised by the cross-motions for summary judgment. Moreover, neither party suggested that there are any genuine issues of material fact with respect to plaintiffs' complaint. Nevertheless, the summary judgment motions relating to plaintiffs' complaint will not be ruled upon at this time for the following reasons.

The parties, in their memoranda, utilize the "shotgun" method of argument. Accordingly, this Court found it difficult to answer each of the parties' contentions in a systematic and orderly fashion. The positions of the parties, especially UTU, seem to change with each response or reply to the prior memorandum. Moreover, the record in this case is remarkably inadequate and incomplete. In several instances the parties rely on documents that are not even in the file! This is not an adequate basis upon which to enter summary judgment on a claim for permanent injunctive relief.

The rulings of this Court on the legal questions related to the NLGA are not subject to further argument. Rather than rule on the parties' cross-motions for summary judgment at this time, however, it is the opinion of this Court that the parties should reevaluate their summary judgment positions in light of this Memorandum. The parties are also ordered to meet and confer for the purpose of: 1) attempting to settle this dispute or come to an understanding as to what, if any, legal or factual issues remain undetermined; 2) stipulating to as many undisputed and necessary facts as possible; 3) organizing the complete documentary record in this case into a presentable form; and 4) determining whether any oral testimony will be necessary on any remaining issue, including the question of whether the preliminary injunction issued herein should be made permanent. The parties shall meet and accomplish these purposes within ten (10) days of the date of this Memorandum. The parties shall appear before this Court on Friday, March 16, 1984, at 10:00 a.m., to report on the results of their efforts. The trial of this case is reset for March 26, 1984.

## IV PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON DEFENDANTS' COUNTERCLAIMS

Plaintiffs' motion for summary judgment on defendants' counterclaim presents a different situation. It can be determined solely by reference to the ICC's orders in this case and the arguments of the parties are more clear.

Count I of defendants' counterclaim alleges that MOPAC violated § 156 of the RLA by unilaterally changing the objective working conditions of its employees without following the procedures of § 156. This Court agrees with plaintiff, as dis-

cussed *supra*, that the ICC's actions exempt MOPAC from the requirements of the RLA. 49 U.S.C. § 11341(a). Accordingly, plaintiffs' motion is granted as to Count I of defendants' counterclaim and said count is dismissed.

Count II of defendants' counterclaim alleges that both MOPAC and KATY violated the orders of the ICC by failing to comply with the N & W Conditions, specifically Article 1, §§ 2 and 4, in connection with the use of KATY employees to operate the trackage rights. Again, as discussed *supra*, this Court agrees with plaintiffs that the ICC orders in question make it very clear that those sections of the N & W Conditions were not intended to apply to the crew selection provisions of the trackage rights agreements. To the extent UTU takes issue with the actions of the ICC, this is not the proper forum for resolution of that issue. 28 U.S.C. §§ 2321(a), 2342. Accordingly, plaintiffs' motion is granted as to Count II of defendants' counterclaim to the extent that that count seeks to force plaintiffs to negotiate the selection of forces to perform the trackage rights authorized by the ICC.

However, Count II of defendants' counterclaim can be read as requesting this Court to order plaintiffs to comply with N & W Conditions, Article 1, § 4, with respect to *issues other than crew selection*. For example, there is no indication that the ICC made the first sentence of the second paragraph of Article 1, § 4, inapplicable to this transaction.[13] *Cf. supra*, note 12. It is clear that plaintiffs did not give the twenty (20) days notice required by Article 1, § 4. *See Finding of Fact No. 17.* It is also clear that KATY complied with Article 1, § 4 with respect to its own employees. *See Finding of Fact No. 21.* But the extent to which MOPAC so complied, with respect to its own employees, is not clear on this record. This may present a question of

fact and, therefore, plaintiffs' motion is denied as to this aspect of Count II of defendants' counterclaim. The parties' conferences, pursuant to Part III of this Memorandum, shall address Count II of defendants' counterclaim.

---

13. The first sentence of the second paragraph of Article 1, § 4, provides:

At the request of either railroad or representatives of such interested employees, negotiations for the purpose of reaching agreement with respect to *application of the terms of conditions* of [these N & W Conditions] shall commence immediately and continue for not more than twenty (20) days from the date of notice.

*N & W Conditions*, Article 1, § 4 (emphasis added). *See Findings of Fact Nos. 8, 17.*